

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. AP-77,067

---

**DEMOND DEPREE BLUNTSON, Appellant**

**v.**

**THE STATE OF TEXAS**

---

### ON DIRECT APPEAL FROM CAUSE NO. 2012CRO000674-D1
### IN THE 49TH JUDICIAL DISTRICT COURT
### WEBB COUNTY

---

RICHARDSON, J., delivered the opinion of the Court in which SCHENCK, P.J., and YEARY, NEWELL, MCCLURE JJ., joined. FINLEY and PARKER JJ., joined, except as to Points of Error five, seven through nine, and thirteen. FINLEY, J., filed a concurring opinion, in which PARKER, J., joined. KEEL and WALKER, JJ., concurred.

## O P I N I O N

In May 2016, a jury convicted Appellant, Demond Depree Bluntson, of two counts of capital murder for fatally shooting twenty-one-month-old D.B., Appellant's son with Brandy Cerny, and six-year-old J.T., Cerny's son from a former relationship. *See* TEX. PENAL CODE § 19.03(a)(8). Based on the jury's punishment phase verdicts, the trial

court sentenced Appellant to death for each count. *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071, § 2(h). Appellant raises twenty-six points of error and five supplemental points of error. We affirm the trial court's judgment of conviction for the capital murder counts but reverse Appellant's sentences of death and remand the case for a new punishment trial.

## I.    Background

On Monday, June 18, 2012, twenty-eight-year-old Brandy Cerny did not show up for work. Her two sons, twenty-one-month-old D.B. and six-year-old J.T., were also missing. Her family called the El Campo, Texas police. Police and family attempted to locate Brandy and the boys, as well as Brandy's Jeep Liberty, throughout the day—by checking her residence, local motels, and the neighboring county where Brandy worked—but their efforts yielded no results. Brandy and her sons were designated "missing persons."

The next morning, June 19, 2012, El Campo detective Robert Holder continued the search for Brandy and her sons by obtaining Brandy's cell phone and bank records. He discovered that on Sunday, June 17, 2012, Brandy's debit card had been used at several places along Highway 59 in Texas: at convenience stores in Beeville and Freer, and then at the Holiday Inn in Laredo. When Holder contacted the hotel, the front desk clerk confirmed that a Brandy Cerny was a registered guest in Room 1408, and "they" had not yet checked out. After the call from Holder, the front desk clerk, on his own

---

[1] Unless otherwise indicated, all subsequent citations in this opinion to "Article" or "Articles" refer to the Texas Code of Criminal Procedure.

initiative, went to Room 1408, knocked on the door, and asked for Brandy Cerny.  A male voice said that she was not there, and the clerk returned to the front desk.

Meanwhile, Holder called the Laredo Police Department to request a "welfare check" on Brandy and her sons.  Patrol officer Esteban Reyes was dispatched to the Holiday Inn for the welfare check.  He arrived at the hotel at 11:49 a.m. and confirmed with the front desk clerk that Brandy Cerny was a registered guest of Room 1408 and had been since June 17, 2012.  Reyes and the desk clerk went to Room 1408 and knocked on the door multiple times.  They identified themselves as "front desk" and "Laredo Police" and explained that they wanted to talk.  No one responded to their knocks.  Both men heard, from inside the room, a male voice "mumbling words," small children "whimpering" and crying, and then the sound of water running.[2]  Reyes again identified himself as a police officer and asked if the children were okay.  Again, no one responded.  Feeling that "something was wrong" and fearing for the safety of the missing persons, Reyes instructed the clerk to open the door with the master key card, which the clerk had obtained from housekeeping.  The key unlocked the door, but the door did not open because the inside security chain was latched.  At that point, Reyes radioed for backup and the desk clerk went downstairs to get approval from his supervisor to break the security chain, if necessary, which she gave.

Officer Raul Medina was dispatched to the hotel as backup.  He arrived at the

---

[2] In describing the children crying, the desk clerk said that the children "were crying in a different way, like when someone is scared or -- they were not crying like normal, and you could hear them, like, kind of crying like in -- like in need of help, … like crying, kind of screaming."

Holiday Inn at 12:03 p.m. and went to Room 1408, where Reyes briefed him on the situation. The officers again attempted to contact the room's occupants. They knocked, announced themselves as Laredo Police, and explained that they were checking on Brandy and the children. The only response was a male voice stating that "there's [sic] kids inside." Believing that the children in the room were in danger and that the situation was an emergency, the officers directed the desk clerk to cut the chain.[3] The desk clerk contacted maintenance to bring bolt cutters to the room. When maintenance arrived, the desk clerk again unlocked the door with the master key, and the maintenance worker cut the security chain.[4] Medina attempted to push the door open, but something was blocking the door. At that point, a gunshot rang out from inside the room. A bullet came through the door about five inches below the peephole, narrowly missing the officers. The officers and hotel employees took cover. Less than a minute later, they heard four more shots. The officers radioed for additional backup and a supervisor.

After backup officers and a supervisor arrived at the hotel, the police forced entry into the room. Officer Heriberto Avalos kicked at the door with his legs while lying on his back on the floor. When the opening was large enough, Avalos made his way into the room past a furniture barricade.[5] He found Appellant lying on the floor with the two

---

[3] Medina explained that he felt that the running water "was being used as a distraction, as a muffle, to muffle sound, something that's going on inside."

[4] After the desk clerk initially opened the door and encountered the latched chain, someone inside the room pushed the door closed.

[5] A table and end table were immediately behind the door. One of the beds had been deconstructed, and the mattress and box spring were erected behind the tables.

children.  A black Hi-Point nine-millimeter Luger handgun was on the second box spring.[6]  Appellant had a laceration on the top of his head.  Both boys had been shot in the head.  Twenty-one-month-old D.B. had been shot in the forehead over his left eye and was dead; six-year-old J.T. had been shot in the right temple but was still alive.  Avalos apprehended and handcuffed Appellant and then administered CPR to J.T., who was eventually airlifted to the hospital where he died.

Later that evening, Brandy's body was found in El Campo in a shack on property belonging to Appellant's father.  She had been fatally shot.  The medical examiner testified that Brandy's body was in a stage of "moderate" decomposition, which typically occurs 60 to 72 hours after death.  However, she said that given the heat that Brandy's body had been exposed to, which would have accelerated the decomposition, the state of decomposition was consistent with Brandy being killed on Sunday, June 17.[7]

A firearms examiner compared the shell casings and bullets associated with Brandy's fatal shooting in El Campo with the shell casings and bullets associated with the fatal shooting of D.B. and J.T. in Laredo.  He testified that he was "absolutely certain" that the same gun—the Hi-Point nine-millimeter Luger handgun found in the hotel room with Appellant—was used to kill Brandy and her sons.

In September 2012, a Webb County grand jury indicted Appellant for two counts of capital murder for fatally shooting the boys and two counts of aggravated assault

---

[6]  The mattress from the second bed was erected to block the window of the room.

[7]  Brandy and her children were last seen alive by Brandy's uncle on Sunday, June 17, "at church" in Wharton (a neighboring town of El Campo) in the company of Appellant.

against a public servant for shooting at the police officers through the door of the hotel room. In May 2016, a jury convicted Appellant of the capital murders, and, based on the jury's answers to the punishment special issues, the trial court sentenced him to death.[8]

## II. Competency to Stand Trial

Five of Appellant's points of error relate to his competence to stand trial and the competency proceedings below. He asserts constitutional and statutory violations due to: the trial court's failure to comply with the statutory procedures set forth in Chapter 46B of the Code of Criminal Procedure (points of error ten and eleven), defense counsel's inadequate representation during the competency proceedings (part of point of error thirteen[9]), and the trial court's response to defense counsel's suggestion of incompetency during trial (points of error fourteen and fifteen). After reviewing the competency proceedings below, we sustained Appellant's eleventh point of error, abated the appeal, and remanded the case to the trial court for a retrospective competency review, if feasible.

On remand, the trial court found that a retrospective competency trial was feasible. The issue of Appellant's competency to stand trial was submitted to a jury in May 2022. The jury found that Appellant was competent during his 2016 trial.

The points of error on original submission that concerned the competency

---

[8] The jury also convicted Appellant of the two aggravated assaults and assessed a 50-year sentence and a $10,000 fine for each count. The appeal of those convictions was filed in the Fifth District Court of Appeals.

[9] In point of error thirteen, Appellant also complains about trial counsel's representation during the hearing on Appellant's request to represent himself. We address this aspect of point of error thirteen later in this opinion.

proceedings (points of error ten, eleven, fourteen, and fifteen, and part of point of error thirteen) were resolved when we abated the appeal and remanded this matter for a retrospective competency trial. We granted Appellant's motion for leave to file a supplemental brief after the retrospective competency trial. In his supplemental briefing, he raises five supplemental points of error regarding the retrospective competency proceedings. Notably, none of them challenge the sufficiency of the evidence to sustain the jury's verdict that he was competent to stand trial in 2016.[10]

In these supplemental points of error, Appellant contends that the trial court erred in its determination that a retrospective competency trial was feasible (supplemental point of error one), complains about evidentiary rulings during the competency trial (supplemental points of error two and three), asserts that the trial court erred in denying his motion for mistrial during the competency trial (supplemental point of error four), and argues that the cumulative effect of the trial court's errors during the retrospective competency proceeding requires reversal (supplemental point of error five).

*Feasibility Determination*

In supplemental point of error one, Appellant contends that the trial court erred in concluding that a retrospective competency trial was feasible. He asserts that the court failed to adequately consider the factors relevant to such a determination.

Both the United States Supreme Court and this Court have recognized the

---

[10] Appellant also "revisit[s]" point of error twelve, which asserts that the trial court erred in denying his request to represent himself. However, point of error twelve is unrelated to the retrospective competency proceedings and is beyond the scope of our remand order and our grant of supplemental briefing.

difficulties inherent in making a retrospective determination of a defendant's competency to stand trial. *See Pate v. Robinson*, 383 U.S. 375, 387 (1966); *Brandon v. State*, 599 S.W.2d 567, 573 (Tex. Crim. App. 1979), *judgment vacated on other grounds*, 453 U.S. 902 (1981). "Some of these difficulties include passage of time, present recollection of expert witnesses who testified at the original hearing, and ability of the judge and jury to observe the subject of their inquiry." *Brandon*, 599 S.W.2d at 573 (citing *Pate*, 383 U.S. at 387). However, such a determination can be made within the limits of due process. *Barber v. State*, 737 S.W.2d 824, 828 (Tex. Crim. App. 1987). "Retrospective determinations are possible depending upon the facts of each case and the quality and quantity of evidence available." *Brandon*, 599 S.W.2d 573.

Appellant argues that the trial court erred in evaluating the availability of evidence upon which a competency determination could be made because the court was "fixated on the wrong time period." He complains that the court failed to appreciate that the available evidence, including the competency evaluations completed before trial, was not specific to the relevant time period—which Appellant contends was only the eleven weeks of the trial itself—because competency "fluctuates."[11] Appellant contends that the

---

[11] Appellant also contends that "the State should have been required to demonstrate that there was available evidence specific to the critical 11-week time period and sufficient for a rational fact-finder to come to a reliable decision on the issue." He urges us to hold that the State has the burden of demonstrating the feasibility of a retrospective competency hearing. We have not held that either party has the burden to demonstrate feasibility, and we do not do so today.

First, a formal hearing on the feasibility issue is not required. *See Turner v. State*, 570 S.W.3d 250, 263 (Tex. Crim. App. 2018); *see* George E. Dix & John M. Schmolesky, 43 *Texas Practice: Criminal Practice and Procedure* § 31:81 (3d ed. 2011) ("At most, a defendant is entitled to be heard on any claim that a retrospective competency inquiry is not feasible. A formal hearing is not necessary."). Second, the feasibility determination is a threshold legal question answered by the court. *See Bruce v.*

(continued ...)

court should have limited its inquiry to evidence that existed during the trial itself and disregarded anything before trial, including prior competency evaluations.

We note, however, that the trial court expressed its understanding that the time of trial was ultimately the focus, noting that it should look at whether enough evidence exists "to see what was going on with [Appellant] during the trial itself." Further, Appellant's own expert at the competency trial demonstrated the flaw in Appellant's attempt to limit consideration of the evidence:

> [I]t's all relevant. Because when you're doing a retrospective, you want information preceding the trial. So across the time leading up to the time of the trial, so you get a sense of what's happening with the mental state and cognition of the individual leading up to the trial, as well as throughout the trial and the sentencing period of the trial.

Appellant also asserts that the trial court erroneously evaluated the availability of evidence without properly examining the evidence. He complains that the trial court was only interested in the "literal availability" of witnesses and evidence. Appellant essentially criticizes the trial court for failing to evaluate whether the evidence demonstrated competency (or lack thereof).

But it is not the trial court's task, in this threshold inquiry, to evaluate the evidence to determine whether it demonstrates competency. The court must simply ascertain if the "quality and quantity" of available evidence, *see Brandon*, 599 S.W.2d at 573, is such that a competency determination can be made—that is, whether the evidence is the type

---

*Estelle*, 536 F.2d 1051, 1057 (5th Cir. 1976) (explaining that feasibility determination is "a threshold legal inquiry" that evaluates "the existence of contemporaneous data (both medical and lay)" that is available for the competency inquiry).

of evidence that provides information about the defendant's mental status. *See, e.g.*, *People v. Ary*, 51 Cal. 4th 510, 520 (2011) ("Feasibility in this context means the availability of sufficient evidence to reliably determine the defendant's mental competence when tried earlier."). As the trial court remarked, "[W]hatever information is available is available" whether it is "in favor" or "not in favor" of competency. The court expressed that "all of that information … could be factored in." The strength or weakness of the evidence—whether it demonstrates competency or incompetency—is left for the factfinder to assess in the competency trial.

Appellant further contends that the trial court failed to consider how the six-year time lapse between trial and remand affected the availability of the evidence. Although relevant, the time factor is not determinative. *See United States v. Makris*, 535 F.2d 899, 904 (5th Cir. 1976). The question for the trial court is whether the available evidence provides a sufficient basis for the factfinder to make an accurate determination. *See id.* ("The passage of even a considerable amount of time may not be an insurmountable obstacle if there is sufficient evidence in the record derived from knowledge contemporaneous to trial."). A reliable reconstruction of Appellant's mental status in 2016 depended less on the timing of the retrospective assessment than on the state of the record.

Here, medical, psychological, and competency evaluations substantially contemporaneous with trial had been done, and the experts for the retrospective evaluation relied on that evidence to make their present diagnoses and opinions on Appellant's retrospective competency. Where such information substantially

contemporaneous to trial is available, the chances for an accurate assessment increase. *See Bruce*, 536 F.2d at 1057. In addition, the 2016 trial transcript, which included statements made by Appellant (his responses to the trial court's questions as well as his interjections throughout trial), was available. *See Makris*, 535 F.2d at 904 (observing that "when [a] defendant's mental state was at issue, the transcript of the trial itself may provide a solid starting point for reliable reconstruction of the pertinent facts"). Given the available evidence, the passage of time did not vitiate the opportunity for a feasible determination of Appellant's competence.

Appellant ultimately asserts that a retrospective competency proceeding "must comport with due process and place the defendant 'in a position comparable to the one he would have been placed in prior to the original trial.'" *See Tate v. State*, 896 P.2d 1182, 1188 (Okla. 1995). The retrospective competency proceeding in this case did so. The trial court found that "all the information that was available to the Court then … it's still the information that is available to us now, and there is no information that would have been available then that is not available to us now."[12] The evidence related to Appellant's mental health throughout the proceedings: at the initiation of the prosecution, as the proceedings progressed, and during the trial. And the evidence came

---

[12] Specifically, the trial court noted the availability of: (1) the mental health providers who examined or interacted with Appellant prior to trial and during the initial competency proceedings, (2) the reports of these providers, (3) the trial court's on-the-record observations of Appellant throughout trial, (4) Appellant's statements on the record (his responses to the trial court's questions and his interjections throughout trial), (5) trial counsel and their documented observations of Appellant and their interactions with him, and (6) Appellant's medical records from the jail documenting his interactions with the jail mental health specialist as well as personnel observations.

from multiple witnesses, both lay and expert, who, from different vantage points, observed Appellant and could describe his conduct. The record evidence indicates that the retrospective competency trial was as reliable as if it had been held prior to trial. *See, e.g., Turner*, 570 S.W.3d at 265 ("There is no hint that the quality or quantity of the evidence had materially changed from the time of trial in a manner that undermined the feasibility of the proceeding. Given the passage of time and the availability of experts, Appellant had more evidence than before to support his claim of incompetency.").

Because the record reflects sufficient available evidence from which a determination of Appellant's competency could be made, the trial court did not err in finding that a retrospective competency trial was feasible. We overrule supplemental point of error one.

## A. *Evidentiary Rulings*

In two supplemental points of error, Appellant challenges the trial court's evidentiary rulings during the retrospective competency trial. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). "An abuse of discretion does not occur unless the trial court acts 'arbitrarily or unreasonably' or 'without reference to any guiding rules and principles.'" *State v. Lerma*, 639 S.W.3d 63, 68 (Tex. Crim. App. 2021) (quoting *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016)). We must uphold the trial court's ruling unless the determination "falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the

case. *Henley v. State*, 493 S.W.3d 77, 93 (Tex. Crim. App. 2016).

In supplemental point of error two, Appellant contends that the trial court erred in allowing the testimony of two lay witnesses, Christina Jarvis and Terry Stanphill. Appellant further contends that the trial court erred by admitting a photograph of him and documents relating to his criminal history.

Christina Jarvis met Appellant in June 2012 on an online dating website where he was using the name "Todd." After texting for a few days, Appellant drove to Austin and stayed with Jarvis and her son for a weekend. This weekend encounter occurred ten days before Appellant was arrested for the instant capital murders. During the weekend, the couple went sightseeing, barbecued, and relaxed and swam at the pool at Jarvis's apartment complex. Appellant told Jarvis of his aspiration to be an underwear model, and she took pictures of him with her camera. One of those photographs, depicting Appellant clothed but with his pants pulled down exposing his underwear, was admitted during Jarvis's testimony. Jarvis testified that Appellant's speech was normal—"nothing weird"—and he communicated effectively. He did not have fragmented speech or incoherent thoughts; he was the one who planned their meals and suggested their outings. Jarvis said that nothing led her to believe that Appellant had a mental illness; she did not observe anything unusual until he left. Jarvis recounted that Appellant left Sunday morning before she woke up, taking her mother's laptop and the SD card from her camera. When she confronted Appellant with the missing items via text, he denied having them. He told her he would return after he fixed his car, but he did not.

Terry Stanphill, the retired Chief of Police of El Campo, testified about his

association with Appellant in 2001 when Appellant worked for him as a cooperating individual after being arrested for delivery of a controlled substance. Stanphill testified that Appellant was "one of the more intelligent people" that he had worked with; Appellant "followed instructions well" and "was always polite and respectful." Stanphill did not observe any difficulties communicating and said that Appellant's undercover interactions "went pretty smooth." He had no concerns with Appellant regarding mental difficulties or illness. Appellant satisfied his cooperation agreement and testified in court on several cases. After Stanphill was excused from the witness stand, the State offered certified copies of court documents relating to Appellant's prior convictions for delivery of a controlled substance and assault.

Before Jarvis's and Stanphill's testimony, Appellant objected on multiple grounds, including that their proposed testimony was not relevant, was more prejudicial than probative, constituted improper character evidence, and violated his right to due process. When the photograph was offered, Appellant objected on relevance grounds. He objected to the criminal history documents because they had not been offered while Stanphill was on the stand, they were "unnecessary" and prejudicial, and their admission violated the Confrontation Clause. The trial court overruled all of Appellant's objections to the testimony and exhibits.

On appeal, Appellant argues that the evidence was inadmissible because it was improper character conformity evidence, lacked relevance, and was unfairly prejudicial. He further argues that the admission of this evidence violated his procedural due process right to a fair opportunity to demonstrate his incompetency.

A person is incompetent to stand trial if he does not have:  "(1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against the person."  Art. 46B.003(a); *see Dusky v. United States*, 362 U.S. 402 (1960).  Evidence relevant to these issues includes whether a defendant can:  (1) understand the charges against him and the potential consequences of the pending criminal proceedings; (2) disclose to counsel pertinent facts, events, and states of mind; (3) engage in a reasoned choice of legal strategies and options; (4) understand the adversarial nature of criminal proceedings; (5) exhibit appropriate courtroom behavior; and (6) testify.  *Morris v. State*, 301 S.W.3d 281, 286 (Tex. Crim. App. 2009); *see* Art. 46B.024.  The Rules of Evidence apply at a retrospective competency trial.  *See* Art. 46B.008.

Evidence is relevant if it has any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence.  TEX. R. EVID. 401.  Evidence need not prove or disprove a particular fact by itself to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving a fact of consequence.  *Gonzalez*, 544 S.W.3d at 370; *see Henley*, 493 S.W.3d at 84 ("Relevancy is defined to be that which conduces to the proof of a pertinent hypothesis—a pertinent hypothesis being one which, if sustained would logically influence the issue.") (quoting *Montgomery v. State*, 810 S.W.2d 372, 376 (Tex. Crim. App. 1990)).  But, if evidence fails to meet this threshold standard, it is inadmissible.  *See* TEX. R. EVID. 402.

Rule 403 excludes otherwise relevant evidence when, among other things, its probative value is substantially outweighed by the danger of unfair prejudice.  TEX. R.

EVID. 403. "The term 'probative value' refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Casey v. State,* 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). "'Unfair prejudice' refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* at 880. All testimony and physical evidence are likely be prejudicial to one party or the other. *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010). It is only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value that Rule 403 applies. *Id.*; *see Johnson*, 490 S.W.3d at 911 ("Under Rule 403, the danger of unfair prejudice must *substantially* outweigh the probative value.").

Rule 404 regulates the admissibility of character conformity evidence—evidence of a person's character used to prove that he behaved in a particular way on a given occasion. *See* TEX. R. EVID. 404(a)(1) (providing that evidence of person's character or character trait "is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait"), 404(b)(1) (providing that evidence of extraneous bad acts "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character"). To violate Rule 404, the evidence must bear specifically on the actor's "character." *See De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) ("The rule excludes only ... evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character.") (citations omitted). In the context of

Rule 404, "character" means "a generalized description of a person's disposition, or of the disposition in respect to a general trait, such as honesty, temperance or peacefulness"; it involves "moral qualities." *See Wheeler v. State*, 67 S.W.3d 879, 882 n.2 (Tex. Crim. App. 2002); Steven Goode & Olin Guy Wellborn III, *1 Texas Practice: Rules of Evidence* § 404.2 (4th ed. 2024).

In separating character conformity evidence from non-character evidence, Rule 404 incorporates the concept of relevance. *See, e.g.*, *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1991) (op. on reh'g). Therefore, in the context of Rule 404, if character conformity evidence contributes even incrementally to a permissible non-character inference, Rule 404 does not bar its admission. *See id.*; *see also Valadez v. State*, 663 S.W.3d 133, 141 (Tex. Crim. App. 2022) (observing that character-conformity evidence may be admissible if it is logically relevant to prove some fact other than character conformity). This is true even if the evidence might also lead to a character conformity inference. *See Montgomery*, 810 S.W.2d at 387. In that event, the opponent's remedy is a limiting instruction that expressly limits the jury's consideration of this evidence to the "non-conformity" purpose, not exclusion of the evidence. *Id.* at 388; *see* TEX. R. EVID. 105(a). Only when the evidence, stripped of any character conformity rationale, fails to satisfy even the threshold standard of relevancy does Rule 404 prohibit its admission. *See Montgomery*, 810 S.W.2d at 387.

Furthermore, if a party's character is directly in issue, the rule does not bar character evidence, "since then it would not be employed to establish a propensity to act in a certain way." *Id.* at 386 n.1 (quoting Goode, Wellborn & Sharlot, *Texas Practice:*

*Texas Rules of Evidence: Civil and Criminal* § 404.2 (1988), at 106). Such evidence would not only be relevant, but it would also be admissible, because it is not rendered inadmissible by Rule 404. *Id.* Rule 405 provides that a trait of character may be proved by reputation or opinion testimony and, where it is "an essential element of a charge, claim, or defense," by specific instances of conduct. TEX. R. EVID. 405.

Appellant's position at the retrospective competency trial was that he suffered from schizophrenia, undiagnosed before his incarceration for the instant capital murder offenses, that rendered him incompetent to stand trial. In support of this position, he presented the testimony of both lay and expert witnesses.

The State's theory at the retrospective competency trial was that Appellant was not mentally ill but suffered from a personality disorder, specifically, antisocial personality disorder, which did not render him incompetent.[13] Or that if Appellant was mentally ill, that illness did not render him incompetent. The prosecutors offered Jarvis's and Stanphill's testimony for their lay observations of Appellant, which, they maintained, presented evidence of Appellant's mental capacity. They asserted that the witnesses' experiences with Appellant showed that his behavior was consistent with antisocial personality traits rather than mental illness. The prosecutors argued that, given his antisocial personality traits, Appellant was unwilling rather than unable to communicate

---

[13] The jury heard evidence that in 2002, TDCJ officials diagnosed Appellant with antisocial personality disorder. In addition, Dr. John Fabian, a forensic psychologist and neuropsychologist who evaluated Appellant in November 2015, diagnosed Appellant with schizoaffective disorder and "other specified personality disorder with antisocial features/traits." Dr. Diane Mosnik, a clinical and forensic neuropsychologist who conducted a retrospective competency evaluation of Appellant in 2019, discounted the TDCJ diagnosis and testified that she "ruled out" antisocial personality disorder.

with his trial counsel and conform his courtroom behavior.  This evidence of unwillingness, the State asserted, was relevant to the issue of competency.  The State further argued that the testimony rebutted the testimony of Rebecca Davalos, an assistant public defender who testified about her observations of Appellant upon meeting him shortly after his arrest for the instant capital murders.[14]

Jarvis's and Stanphill's observations about Appellant—his speech, his demeanor, his thought processes, and the absence of expressions of mental illness—were not offered as evidence of character let alone evidence of character conformity.  Rather, the State offered evidence suggesting that Appellant's purported mental illness evolved over time, only starting after he was arrested in this case.  The prosecutors highlighted the fact that Appellant's initial encounters with several mental health providers reflected no indications of mental illness or symptoms of psychosis.

The fact that Jarvis testified that Appellant exhibited no symptoms of psychosis just ten days before his incarceration began is evidence that the trial court could reasonably conclude was relevant—particularly given Davalos's testimony that he did show such symptoms shortly after his arrest.  In addition, the trial court could reasonably conclude that the prejudice stemming from Jarvis's testimony, if any, did not substantially outweigh its probative value.

---

[14] Davalos described Appellant's demeanor, speech patterns, and behavior in court.  She testified that on her first visit with Appellant shortly after his arrest, she was able to communicate with him "to a certain extent," but Appellant was "pretty upset" about his treatment in jail and was in "a mental loop" about those issues.  Davalos said that she had concerns about Appellant's mental health, which persisted at the next visit.  So, the defense team requested a psychological evaluation.  But Davalos ultimately conceded that their request was for a psychological assessment not a competency evaluation.

The trial court could have reasonably concluded the same about Stanphill's testimony. The fact that his testimony described Appellant in 2001 (when the issue was his mental state in 2016) does not render it irrelevant or unfairly prejudicial. The State elicited evidence that personality disorders, including antisocial personality disorder, involve a long-term pattern of behavior. The prosecutors were attempting to establish such a long-term pattern of antisocial behavior in Appellant. In addition, Stanphill's association with Appellant occurred when Appellant was nineteen or twenty years old— the age when, according to the expert testimony, schizophrenia would have been likely to manifest. Stanphill's testimony refuted the idea that Appellant suffered from undiagnosed schizophrenia. On this record, we cannot conclude that the trial court's decision to admit this testimony, even though it addressed conduct somewhat remote in time, was an abuse of discretion. *See, e.g.*, *Ex parte Watson*, 606 S.W.2d 902, 905 (Tex. Crim. App. 1980) (concluding in retrospective competency trial that high school report card from 1955–59 was relevant to competency in 1972).

Regarding the criminal history documents, we note that the nature of a competency hearing differs from that of the adversarial trial on the merits. As we have explained:

> The basic purpose for the exclusion of extraneous offenses is to prevent the accused from being tried for some collateral crime or for being a criminal generally. Such purpose is not applicable in a competency hearing. A petitioner's guilt or innocence is to be determined in a separate trial where extraneous offenses are generally prohibited. In a competency hearing, all relevant facts concerning [a] petitioner's mental competency should be submitted to the jury.

*Ex parte Harris*, 618 S.W.2d 369, 373 (Tex. Crim. App. 1981). Accordingly, we have

held that extraneous offenses, which are ordinarily inadmissible during trial on guilt, are admissible during a competency hearing. *Id.*

The State offered evidence of Appellant's extraneous offenses—the theft from Jarvis and his prior criminal convictions—to demonstrate a pattern of behavior consistent with antisocial personality disorder. This was not an invitation to draw an inference of competence solely from Appellant's apparent character as a criminal in general. Rather, the evidence supported a claim of a personality disorder and tended to refute a claim of mental illness tending to show incompetency, with germane information about Appellant's antisocial behavior as reflected by his criminal past.

In *Ex parte Harris*, the State built its case around the defendant's manipulative behavior. This Court concluded that evidence of extraneous offenses was relevant to develop the State's theory that the defendant feigned mental illness. *See Harris*, 618 S.W.2d at 373 ("The extraneous offense related to a disputed material issue in the case: appellant's competency.") Similarly, here, the State contended that Appellant suffered from antisocial personality disorder and was manipulating the system and feigning psychotic symptoms. *See Perkins v. State*, 664 S.W.3d 209, 216 (Tex. Crim. App. 2022) ("Extraneous-offense evidence is generally admissible if the evidence is relevant to a fact of consequence apart from its tendency to prove character conformity.").

Given the contested issues at the retrospective competency trial, we cannot conclude that when admitting Jarvis's or Stanphill's testimony or the criminal history documents, the trial court acted "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *See Lerma*, 639 S.W.3d at 68. Nor can we conclude that

the court's ruling fell "outside the zone of reasonable disagreement." *See Johnson*, 490 S.W.3d at 908.

Regarding the photograph of Appellant that was admitted during Jarvis's testimony, which represented Appellant's aspiration to be an underwear model, we will assume without deciding that it was not relevant.

Ordinarily, the erroneous admission of evidence is non-constitutional error. *Gonzalez*, 544 S.W.3d at 373. Non-constitutional error must be disregarded unless it affects the defendant's substantial rights. TEX. R. APP. P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). If we have a fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but a slight effect, we will not overturn the conviction. *Gonzalez*, 544 S.W.3d at 373. In making this determination, we consider: the character of the alleged error and how it might be considered in connection with other evidence; the nature of the evidence supporting the verdict; the existence and degree of additional evidence supporting the verdict; and whether the State emphasized the error. *Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021).

This was a single photograph, which, as counsel acknowledged, was "not a bad photo," in a multi-day, multi-witness, multi-expert trial. The primary contested issues were whether Appellant suffered from a mental illness (schizophrenia) or a personality disorder (antisocial personality disorder) or both and, if Appellant was mentally ill,

whether that illness rendered him incompetent to stand trial. In light of all the evidence, the photograph was insignificant.

Various lay witnesses and multiple experts testified about Appellant's mental health. All the experts acknowledged that, at various times and to varying degrees, Appellant exhibited symptoms of psychosis or schizophrenia, though they differed on whether Appellant also had a personality disorder and whether Appellant's mental illness rendered him incompetent to stand trial. This photograph did not detract from the extensive expert testimony concerning Appellant's mental health; it did not enhance or contradict the mental health evidence. Further, although the prosecutor briefly referenced "those pictures that we showed you from the camera" when discussing Appellant's theft from Jarvis, the State did not emphasize the photograph in its closing argument.

Under these circumstances, we have a fair assurance that the photograph of Appellant did not influence the jury or had but slight effect on the jury's competency verdict. Further, we cannot conclude that the erroneous admission of the photograph denied Appellant a fair opportunity to raise his incompetence or to participate meaningfully in the retrospective competency trial.

Finding no error in the admission of the complained-of testimony or the criminal history documents and finding no harm or due process violation in the erroneous admission of the photograph, we overrule supplemental point of error two.

In supplemental point of error three, Appellant argues that the trial court erred in excluding rebuttal testimony from his expert, Dr. Diane Mosnik. Mosnik, a clinical and forensic neuropsychologist, was retained by Appellant's habeas counsel to conduct a

retrospective competency evaluation of Appellant. She testified at the retrospective competency trial, describing the process of conducting a retrospective competency evaluation and explaining the scientific literature supporting such an evaluation. She testified that she reviewed historical records (Appellant's medical/mental health records, his school records, his criminal history records, recordings of jail phone calls, and transcripts of the 2016 trial) and conducted a clinical interview with Appellant. The interview, conducted in October 2019, lasted approximately three hours and included a battery of psychological tests. Based on her records review, interview with Appellant, and testing, Mosnik diagnosed Appellant with schizophrenia. She concluded that because of his symptoms—"his intricate delusional system of fixed false beliefs," which "indicate a break from reality"—Appellant was not competent to stand trial in 2016.

Dr. John Fabian, a forensic psychologist and neuropsychologist, was hired by Appellant's trial counsel to evaluate Appellant for "forensic issues." He did not testify at the 2016 trial but testified for the State at the retrospective competency trial. Fabian evaluated Appellant in November 2015, four months before trial. He reviewed records, including the January 2015 report of a competency evaluation by Dr. Michael Jumes that found Appellant competent to stand trial, and spoke with defense counsel and jail officers. He met with Appellant for "ten-plus hours," administered a battery of tests (including IQ testing and tests for malingering), and conducted a competency evaluation. Fabian diagnosed Appellant with schizoaffective disorder (a hybrid of schizophrenia and mood disorder) as well as a personality disorder with antisocial features/traits. He explained that Appellant met some but not all the criteria for a diagnosis of antisocial

personality disorder. Notwithstanding these diagnoses, Fabian found Appellant competent to stand trial. Fabian testified that this was "a complicated case": there was evidence of mental illness but also of a personality disorder and "certainly self-destructive behaviors [and] manipulation." He had a concern about exaggeration of symptoms but also noted genuine symptoms of mental illness. Ultimately, Fabian opined that, despite his mental illness, Appellant was competent to stand trial.[15] Fabian further opined, when asked by the prosecutor, that a competency evaluation conducted at or near the time of trial would be "more relevant or accurate" than an evaluation that occurred years after trial.

After the State rested, Appellant sought to recall Mosnik to rebut Fabian's testimony that his competency evaluation was more accurate than a retrospective evaluation. Appellant argued that the rebuttal testimony was admissible pursuant to Article 36.01, which provides that "rebutting testimony may be offered on the part of each party."[16] *See* Art. 36.01(a)(7). Appellant further argued that the exclusion of Mosnik's rebuttal testimony "deprived [him] of the right to a fair determination of his

---

[15] Fabian explained that Appellant was "capable of really understanding the nature and objectives of the legal proceedings. He was able to consult with his lawyer if he wanted to. He had a rational understanding of the legal proceedings. And he could make rational legal decisions."

[16] The State objected to the proposed rebuttal testimony, asserting that it did not meet the criteria of Article 36.02, which controls when a court must reopen evidence. *See* Art. 36.02 (requiring trial court to "allow testimony to be introduced at any time before the argument of a cause is concluded, if it appears that it is necessary to a due administration of justice"); *see also Peek v. State*, 106 S.W.3d 72, 79 (Tex. Crim. App. 2003) (concluding that proffered evidence is "necessary to a due administration of justice" if it "would materially change the case in the proponent's favor"). The State argues the same in its supplemental brief. However, Appellant asserts, as he did at trial, that Article 36.02 does not apply because the statute addresses "re-opening" the evidence and here, while both sides had rested, neither side had closed. Because Appellant does not argue that Mosnik's testimony was admissible under Article 36.02, we need not decide whether her rebuttal testimony was admissible under that provision.

competency." The trial court denied Appellant's request for rebuttal testimony.

Appellant raises the same arguments on appeal, asserting that the trial court should have allowed Mosnik's rebuttal testimony pursuant to Article 36.01 and that the exclusion of her rebuttal testimony violated his due process right to a fair opportunity to present evidence of incompetency. *See* Art. 36.01(a)(7); *Medina*, 505 U.S. at 445.

Appellant's reliance on Article 36.01(a)(7) is misplaced. Article 36.01 governs the order of the proceedings at trial; it does not address the admissibility of evidence. *Powell v. State*, 63 S.W.3d 435, 439 (Tex. Crim. App. 2001). That is, the statute controls when in the trial proceeding rebuttal evidence may be offered and by whom. But it does not address what the content of that rebuttal evidence may be.

Moreover, as the trial court noted—and as Appellant concedes in his brief—Appellant could have asked Mosnik why her retrospective competency evaluation was more reliable or accurate than the two pretrial competency evaluations.[17] Mosnik was aware of these prior competency evaluations; she reviewed them as part of her retrospective evaluation and discussed them in her testimony. Counsel could have asked her why her evaluation, which they repeatedly characterized as more thorough, warranted confidence over those closer in time to the 2016 trial. In his brief, Appellant contends that Mosnik's proposed rebuttal testimony would have allowed her to demonstrate that her opinion "was both more pertinent and more soundly-based than Dr. Fabian's." But he fails to explain why he could not have elicited such testimony during his case-in-chief

---

[17] Appellant acknowledges that "it is true that defense counsel could have questioned Dr. Mosnik about the value of her opinion in comparison to that of other experts."

nor does he suggest that the trial court prevented him from doing so. Appellant could have questioned Mosnik about the comparative reliability of the prior evaluations and had her provide more detailed information about the scientific support for her retrospective evaluation when she testified on direct examination. He did not.

Appellant's counsel asserted to the trial court that they were unaware that Fabian would be asked to compare his trial-era competency evaluation to Mosnik's 2019 retrospective competency evaluation. But such a comparison was readily foreseeable. All the mental health experts agreed that, at various times and to varying degrees, Appellant exhibited symptoms of psychosis. They differed as to whether his mental illness rendered him incompetent to stand trial. The jury was confronted with multiple competency evaluations rendering different opinions—one conducted thirteen months before trial finding him competent, one conducted four months before trial finding him competent, and one administered almost three-and-a-half years after trial finding him incompetent. Questions as to why the jury should credit evaluations reaching one conclusion over another evaluation reaching the opposite conclusion should have been expected.

The record demonstrates that Appellant had a fair opportunity to present his case for incompetency. The trial court did not abuse its discretion in excluding Mosnik's rebuttal testimony. We overrule supplemental point of error two.

## B. *Denial of Mistrial*

In supplemental point of error four, Appellant contends that the trial court erred in denying his motion for mistrial during the retrospective competency trial, which was

based on alleged judicial bias.

"A mistrial halts trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). It is appropriate "only in 'extreme circumstances' for a narrow class of highly prejudicial and incurable errors." *Id.* (quoting *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004)).

We review the denial of a mistrial for an abuse of discretion. *Balderas v. State*, 517 S.W.3d 756, 783 (Tex. Crim. App. 2016). We view the evidence in the light most favorable to the court's ruling, considering only those arguments before the court at the time of the ruling. *Ocon*, 284 S.W.3d at 884. We must uphold the ruling if it was within the zone of reasonable disagreement. *Id.* Whether an error requires a mistrial must be determined by the particular facts of the case. *Id.*

Appellant asserts that he was entitled to a mistrial because of the trial judge's "demonstrable bias" against him, his counsel, and his case throughout the retrospective competency proceedings. In this multi-faceted assertion, Appellant provides a litany of alleged trial court partiality, including the judge's: "attitude to the remand" and the retrospective competency proceedings; disparate treatment of the parties; hostility to Appellant's legal arguments, particularly concerning the feasibility determination; hostility to evidence of Appellant's mental illness; hostility to defense counsel, as evidenced by a "pattern of distrust and criticism" and repeated admonishments to counsel; "repeated and unnecessary interruptions of the defense case"; and the denial of Appellant's rebuttal case. Appellant argues that the judge's conduct violated his due

process right to a fair opportunity to demonstrate that he was incompetent when he was tried in 2016. *See Pate*, 383 U.S. at 378; *Medina*, 505 U.S. at 445.

A criminal defendant has a due process right to proceed before an impartial court. *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973); *Brumit v. State*, 206 S.W. 3d 639, 645 (Tex. Crim. App. 2006). As the Supreme Court has explained, "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." *Liteky v. United States*, 510 U.S. 540, 551 (1994). Absent a clear showing of bias, we presume a trial court is neutral and detached. *Tapia v. State*, 462 S.W.3d 29, 44 (Tex. Crim. App. 2015); *Brumit,* 206 S.W.3d at 645.

"Thus, a judge's remarks during trial that are critical, disapproving, or hostile to counsel, the parties, or their cases, usually will not support a bias or partiality challenge" unless they reveal "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Gaal v. State*, 332 S.W.3d 448, 454 (Tex. Crim. App. 2011) (quoting *Liteky*, 510 U.S. at 555). "[E]xpressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women" may display do not establish bias or partiality. *Id.* (quoting *Liteky*, 510 U.S. 540 at 555–56).

We must also appreciate that "a trial court's inherent power includes broad discretion over the conduct of its proceedings." *Gonzalez v. State*, 616 S.W.3d 585, 594 (Tex. Crim. App. 2020) (quoting *State ex rel. Rosenthal v. Poe*, 98 S.W.3d 194, 199 (Tex. Crim. App. 2003)). Consequently, a trial court's ordinary efforts at courtroom

administration—even if "stern and short-tempered"—do not show bias. *Liteky*, 510 U.S. at 556; *see Gaal*, 332 S.W.3d at 454.

Appellant cites multiple examples of alleged bias based on the trial court's rulings, exchanges between the trial judge and defense counsel, and the trial court's admonishments to defense counsel. Undoubtedly, the record reflects frustration and annoyance on the part of both the trial judge and defense counsel. On several occasions, counsel's remarks to the court clearly showed that counsel felt aggrieved. And, at times, the trial judge perhaps expressed some irritation with how defense counsel was proceeding. But none of the judge's statements went beyond the bounds of expressions of dissatisfaction that "imperfect [people]" can sometimes express. *See Liteky*, 510 U.S. at 555–56. And, as Appellant concedes, many of the complained-of comments were not in front of the jury.

After reviewing these allegations of bias in context, *see, e.g.*, *Brumit*, 206 S.W.3d at 640–41, 645 (viewing trial judge's comments in context of evidence that was before judge), we conclude that the record does not support Appellant's contention that the trial judge ceased to function as a neutral and detached judge. The "high degree of favoritism or antagonism" must be clearly apparent from the judicial comments or conduct itself without interpretation or expansion of the words. *See Gaal*, 332 S.W.3d at 457–58. Without the lens of aggrievement, the complained-of remarks and conduct do not reveal a high degree of favoritism towards the State or antagonism against Appellant so as to render fair judgment impossible. *See Liteky*, 510 U.S. at 555. We do not find in the record the imbalance or disparate treatment of the parties that Appellant suggests.

Instead, Appellant's examples reflect unfavorable judicial rulings, routine trial-administration efforts, or ordinary admonishments to counsel.

Considering the record of the retrospective competency proceedings as a whole, we find no clear showing of bias sufficient to overcome the presumption that the trial court acted in a neutral and detached manner. We cannot conclude that the complained-of rulings, comments, or actions, either separately or collectively, demonstrate the type of impermissible bias or partiality that would violate an individual's right to a fair trial. Therefore, we discern no abuse of discretion in the trial court's denial of Appellant's motion for mistrial. We overrule supplemental point of error four.

### C. *Cumulative Error*

In supplemental point of error five, Appellant urges this Court to consider the cumulative impact of the errors alleged in his supplemental points of error. He maintains that the synergistic effect of the errors irreversibly tainted the outcome of the retrospective competency proceeding and requires reversal.[18]

"Though it is possible for a number of errors to cumulatively rise to the point where they become harmful, we have never found that 'non-errors may in their cumulative effect cause error.'" *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009) (quoting *Chamberlain v. State*, 998 S.W.2d, 230, 238 (Tex. Crim. App. 1999)) (internal citations omitted). In light of our disposition of Appellant's supplemental points of error—finding no error as to all but part of one and harmless error as to that part—we

---

[18] It is unclear what reversal Appellant seeks in supplemental point of error five: reversal of the competency finding or reversal of his conviction.

cannot conclude that there is a cumulative effect of harm. We overrule supplemental point of error five.

## III. Representation Issues

Appellant raises four points of error concerning the legal representation at his 2016 trial. He argues that the trial court erred in failing to appoint substitute counsel (point of error seventeen), denying his request to represent himself (point of error twelve), and failing to ensure that he had adequate representation at the hearing on his request to represent himself (point of error thirteen). Appellant further argues that his trial counsel violated his right to decide the objective of his defense by conceding his guilt during trial (point of error sixteen).

### A. *Relevant Background*

On the day of Appellant's arrest in June 2012, the local public defender, Hugo Martinez, was appointed to represent Appellant. Four months later, in October 2012, when the State filed its notice of intent to seek the death penalty, the trial court appointed the Regional Public Defender for Capital Cases (RPDCC) based in Lubbock, Texas, to represent Appellant and appointed Martinez as third chair.[19] However, the trial court subsequently learned that Webb County had not contracted with the RPDCC, and the court's attempt to retroactively contract with the organization were unsuccessful. Therefore, on October 30, 2012, the trial court appointed capital-qualified local attorneys

---

[19] The RPDCC is a collaborative effort between counties to provide legal representation throughout the state for indigent defendants charged with capital murder when the State seeks the death penalty.

J. Eduardo Pena as first chair and his brother Oscar J. Pena as second chair. Martinez was again appointed as third chair.

In December 2012, at Appellant's first court appearance with appointed counsel, the trial court asked counsel if they were concerned that a police report had not yet been generated six months after the offense (and approximately two-and-a-half months after indictment). Before counsel could respond, Appellant expressed that he was concerned because he had been indicted and, as he understood it, that meant the State was ready for trial. But the State was not ready for trial, so he was "confused." The trial court indicated that "[the State not being ready for trial] would be left to any motion being filed." Appellant then asked if he could "have a lawyer outside of this region" because the first time he met with his attorneys "they said some discouraging remarks to [him] that gave [him] less confidence as far as them representing [him] to the fullest." Appellant said that as a result, he had since refused to speak with his attorneys whenever they visited him at the jail.

The court explained to Appellant that he was entitled to have an attorney represent him, but he did not have the right to select his lawyer. The court noted that the case was just starting and that it had been only five weeks since counsel had been appointed. The court advised Appellant that "the best thing you can do is communicate with your lawyer[s] because if you don't[,] you're not going to be helping yourself in that area. You have to do what's your part to be able to help your counsel defend you, as well." The court informed Appellant that J. Eduardo Pena was the only attorney in the county on the capital-qualified list and he could "do the job well." Appellant responded that he was not

doubting Pena's experience but repeated that "some of the remarks that he said to me about him representing me … made me discouraged." Ultimately, the trial court declined to grant Appellant different counsel, and Appellant agreed to "work with [his] lawyers."

In subsequent court appearances in 2013, Appellant repeatedly interrupted the proceedings to complain about the process: at an evidence exchange hearing, Appellant again questioned the legitimacy of the indictment because the State was not ready for trial; at a pretrial hearing after defense counsel raised the issue of competency, Appellant invoked his right to a speedy trial; and at a pretrial hearing on defense counsel's motion to abate the competency proceedings, Appellant asserted his right to a speedy trial and a change of venue "for Houston, Texas." But, on these occasions, though he expressed his dissatisfaction with how his case was proceeding, Appellant did not again ask for substitute counsel.

In January 2014, Appellant sent a letter to the trial judge informing the court of his decision to represent himself "from this point on." He complained that he had not yet seen a doctor (for the competency examination) but did not express dissatisfaction with his appointed counsel in the letter. In February 2014, defense counsel filed a motion to withdraw their request for a competency examination (and a jury trial on the competency issue), asserting their opinion that Appellant was competent to stand trial based on recorded jail calls counsel had received.

In April 2014, at a status hearing to schedule a hearing on defense counsel's motion to withdraw the competency evaluation as well as Appellant's request for self-representation, Appellant complained that he was being "misrepresented," and that "the

way [his lawyers] have acted, the stuff that they have done has shown that they do not work for me." Appellant asserted that his right to a speedy trial in Houston was being "trampled on" and complained that, after being housed in Zapata County, he had been brought back to Webb County where he did not have access to the law library or recreation. Appointed counsel responded to Appellant's criticism, informing the court that in the "numerous times" they visited Appellant in the jail, he refused to talk to them, typically walking out after a few minutes. Counsel lamented that Appellant "refuse[d] to cooperate in any way with his own defense."

The next month, at the pretrial hearing on defense counsel's motion to withdraw the competency examination, Appellant interrupted the proceedings to inform the trial court that he did not speak to his appointed attorneys, and he was "pretty sure" they knew how he felt about them. He asserted that because of "[s]ome of the things that they have said to me, some of the things that have been done to me," he had to "lift [him]self up" because if he did not, he knew he would "go down." Defense counsel mentioned that they had "a conflict" with Appellant because he did not want them to withdraw the insanity defense.[20] Appellant expressed that he felt like his rights were "being trampled on every day" and that he does not talk to "these people" (referring to appointed counsel) because "they have been not representative of me on a lot of different things they've said to me as well as in the court."

---

[20] Defense counsel filed a notice of intent to rely on the insanity defense in May 2013. In December 2015, counsel file a notice of withdrawal of the insanity defense.

After the completion of Appellant's competency evaluation (which found him

competent to stand trial), the trial court held a hearing in March 2015 on Appellant's

request to represent himself.  The following exchange occurred:

THE COURT:          We are here on a motion that you filed on your own. And then, of course, you have been requesting that you wanted to represent yourself, I think. Is that correct?

[APPELLANT]:        (Defendant nods head.) That is correct.

THE COURT:          Okay. You -- you still insist on having this Court hear that motion, or do you want to do something other than that?

[APPELLANT]:        I want to proceed with my case. I want --

THE COURT:          I want to proceed with your case as well. What I want to know is, you indicated that you -- you have some interest in representing yourself. Is that -- is that correct?

[APPELLANT]:        That is correct, 'cause my rights were not being met. That's why I have invoked my rights to a speedy trial, and it was not represented.

THE COURT:          Okay. So then do you want to insist on doing that now, or would you rather --

[APPELLANT]:        I spoken with --

THE COURT:          -- withdraw that?

[APPELLANT]:        -- and I -- and I -- and I don't -- I -- I'm not sure as far as if she's going to represent me as well.[21] And these two individuals have not. So I don't know 'cause just I've met her. So as far as me representing myself, I don't understand all the legal obligations or the legal jargon, but I -- I would like assistance, but not from

---

[21]  The record reflects that Appellant was referring to Elizabeth Martinez, who was substituted as third chair counsel after Hugo Martinez was elected as a county-court-at-law judge.

someone that's going to work with the District Attorney's office.

THE COURT: Hmmm. Okay. So you would like to have a lawyer?

[APPELLANT]: And I would like to have a lawyer if I have a lawyer that's going to work for me. If I don't have a lawyer that's going to work for me or if it's going to work with the District Attorney's office, then it's not going to benefit me any.

THE COURT: Okay. You understand that -- that the lawyers that you got appointed -- first of all, you understand that you have the right to have a lawyer. You also -- you definitely understand that you have the right to have a lawyer represent you throughout this process, right? You understand that?

[APPELLANT]: I understand that.

THE COURT: And -- and you have the right that -- if -- to hire your own lawyer, retain your own lawyer, if, in fact, you have the money to be able to do so.

[APPELLANT]: In fact, if I could afford my own attorney, that's what I would do, so --

THE COURT: Right. But you understand that you do have that right. Okay.

Now, once you make the decision, yes, I do want a lawyer, right? And then the next step is, can I afford my own lawyer? And then once that question has been answered with a, "No, I can't; I'm indigent", then the Court has an obligation to appoint lawyers to represent you, right.

[APPELLANT]: As you said, you didn't send the papers out to the 11th Region to -- so you -- and you assigned these attorneys to me.

The trial court explained to Appellant the process for appointing counsel in a

capital case in which the State seeks the death penalty. The court then returned to the issue at hand:

THE COURT: Okay. And if you didn't understand that, I'm letting you know that. That's the way it is, okay?

So, that's one thing that prevents me from just appointing whoever it is that you want, one. Two --

\* \* \*

The second reason that -- that I cannot appoint whoever you want is because you don't have the right to choose who you want. Once you become indigent, you have the right to have a lawyer, but you don't have the right to choose which lawyer. My obligation is to make sure that the lawyers that I appoint to you are on this special list, as lawyers who are qualified to be on the death penalty defense list, as Mr. Pena is, and Mr. Oscar Pena is on the list for second chairs, I believe; is that correct?

[COUNSEL]: Yes, sir.

Appellant continued to express his belief that the court was going to "[fax] papers to the 11th Region" (RPDCC). So, the trial court again explained to Appellant that attorneys from the RPDCC could not represent Appellant because Webb County had not contracted with that office. The court then continued questioning Appellant to determine if he wanted to represent himself or wanted the assistance of counsel:

THE COURT: Now that I've -- now that I have clarified that for you, sir, my question still remains to you -- we are getting ready to start a hearing here to see if -- because you have told us that you'd like to represent yourself without a lawyer. You're telling me now that, no, you do want a lawyer, right?

[APPELLANT]: If my lawyer's not going to work for me, then I have to

work for myself to the best of my abilities. If my lawyers are not going to work for me, I have to work for myself to the best of my ability under the Constitution of the United States of America.

THE COURT: Okay. My question is very simple.

[APPELLANT]: I invoked my rights to a speedy trial in 2013.

THE COURT: Right.

[APPELLANT]: I understand that under the Bill of Rights I have my right --

THE COURT: Right now I want to talk to you -- I only want to talk to you about one thing -- about whether or not you want to represent yourself without a lawyer.

[APPELLANT]: Me representing myself, will I still have access to my rights? Because I don't know all my rights since I'm not allowed to go to the law library.

THE COURT: Okay.

[APPELLANT]: Would I -- will I still -- will I still have my rights?

THE COURT: You have your rights, Mr. Bluntson, as a criminal defendant unless, of course, you decide to waive some of those rights. You do have your rights as a criminal defendant afforded to any criminal defendant in this state and this country. You understand that?

[APPELLANT]: Well, I just -- a lot of things have been happening that's not according to my rights.

THE COURT: Is that -- is that a yes that you understand them, or a no, that you don't?

[APPELLANT]: I understand what you're saying --

THE COURT: Very well.

[APPELLANT]: -- about my rights. It's just I haven't felt that.

THE COURT:     All right. But you do understand that you do have those rights?

[APPELLANT]:   I -- I understand that I should have those rights.

THE COURT:     Okay. Can you -- and do you understand that I've told you that -- not whether you believe you have -- you – you've been afforded them or not. What I'm -- what I'm asking you is, do you understand that I've told you that you do have those rights?

[APPELLANT]:   That's wonderful to know.

THE COURT:     Is that a yes?

[APPELLANT]:   That's -- that is wonderful to know that I have my rights. Thank you, Judge.

THE COURT:     Thank you, sir. All right.

[APPELLANT]:   That is wonderful.

THE COURT:     So, after all of that, I still don't know whether or not you would like to proceed to represent yourself, or if you -- if you are insisting on your motion to represent yourself -- in fact, where's the file? Or if you would like to continue with this group of lawyers. Not -- not that you have the right -- maybe I shouldn't say it that way. If you represent yourself, or if you would like to continue -- or if you would like to withdraw that motion that you made and -- and perhaps what I should do is just go ahead and go through this thing so that you don't bring it up to my attention again in a few months.

[APPELLANT]:   Please.

Defense counsel then briefly explained to the court why they felt that Appellant was not competent to represent himself. The court subsequently recessed to address other matters. When court reconvened, the prosecutor attempted to clarify whether Appellant

wanted counsel or wanted to represent himself.  Appellant asked, "Me having an attorney doesn't take away my rights, correct? That still -- they can't deny me my rights."  The court explained to Appellant that having a lawyer does not mean giving up his rights but that counsel were there to "enhance his rights."  However, the court cautioned Appellant that his lawyers were "not just [his] microphone," advising Appellant that counsel would not merely repeat what Appellant said or automatically do what he told them; they would evaluate what he said and wanted and present the case accordingly.  The following exchange ensued:

> THE COURT: You've indicated to us at some point that you may want to do that. All I want to know today, okay, is, is that really wanted -- what you wanted to tell me, or did you want to say, well, I -- I -- because earlier you said, Judge, I -- I think I do need a lawyer, but I -- I just don't want these lawyers, right?
>
> [APPELLANT]: Well -- well, you know, I mean, it would be nice to have a lawyer in a legal proceeding, especially if you have somebody that's trained for it.
>
> THE COURT: Okay.
>
> [APPELLANT]: But in the same instance, if you've got someone that's not working for you and (inaudible), and I asked them, then how can I be represented by somebody?
>
> THE COURT: Okay.
>
> [APPELLANT]: I have to represent myself and don't have the legal understanding or the jargon. It's still in the same point. I still have to stand up for myself. There's nobody else that's standing up for my constitutional rights.
>
> THE COURT: All right. But you don't really want to do that, right?
>
> [APPELLANT]: I would like to not do it, but I will.

THE COURT:      Okay.

[APPELLANT]:    It's easy. I will. I would like to not do it, but I will.

THE COURT:      Okay.

[APPELLANT]:    I will represent -- I just want to make sure that, if I do do it, I want my rights. I don't want to have to say, hey, what do I do now? You know, my rights. I want my rights. 'Cause under the statute of limitations, it's like once you do something, there's still stuff that you have to do. You just -- you can't break the law.

THE COURT:      Mister --

[APPELLANT]:    I know under the Constitution of the United States of America --

THE COURT:      Mr. Bluntson, clearly I understand what you're saying. You want your lawyers to fight vigorously for you. You -- your interpretation of perhaps what they have been doing is -- is that they have not been. That interpretation may be erroneous. I'm not here to -- to -- to tell you otherwise. You are -- you're -- you can -- you can have your own opinion with regard to that.

The trial court then explained to Appellant that his appointed counsel were the only attorneys in Webb County on the capital appointment list. The trial judge expressed, based on his experience with them, that counsel were both "extremely competent" so the judge believed that Appellant was "being taken care of." The exchange then continued:

THE COURT:      Now, it doesn't mean you have to agree with all of that, but I just need to know -- you can tell me, sir -- you want your rights defended, right? You want to defend yourself on this case?

[APPELLANT]:    I will defend myself on this case.

THE COURT:      No, what I'm saying is --

[APPELLANT]:    I will defend myself on this case.

THE COURT:    You want them --

[APPELLANT]:    I want you to respect my rights when I file the papers --

THE COURT:    Listen -- listen to what I'm saying.

[APPELLANT]:    -- to -- to -- to respect that.

THE COURT:    Can you respect this? Listen to what I'm saying. I want it clearly -- clear language, Mr. -- Mr. Bluntson. You want to be able to defend your case with a lawyer? You'd like to do it with a lawyer?

[APPELLANT]:    It would be very, very nice to have a lawyer.

THE COURT:    All right.

[APPELLANT]:    But at the same moment, if my lawyer is not working for me, then I do not need a lawyer.

THE COURT:    All right.

Martinez, the newly appointed third chair counsel, then addressed the court. She acknowledged that Appellant had not been communicating with his attorneys and explained that, after visiting with Appellant, she believed that the rights he was complaining about not having were access to the law library and use of the telephone. J. Eduardo Pena then confirmed that Appellant had refused to talk to him and his brother since November 2012, despite their repeated attempts to communicate with him, which included letters sent to him about certain issues with which they needed his assistance.

Despite Appellant's equivocation about representing himself, the trial court proceeded with the hearing on his self-representation request. Defense counsel asked the

trial court to take judicial notice of the January 2015 report prepared by Dr. Michael Jumes, the psychologist who evaluated Appellant for competency to stand trial in December 2014 and found him to be competent, and the trial court did. Counsel noted several portions of the report—including that Appellant reported that his thoughts were being controlled from outside of himself, that he was being tortured, that "a lot of stuff is being done to his brain," and that there was a conspiracy to kill him—and expressed their belief that "all of these are symptoms of a serious mental illness." Counsel also offered Appellant's medical records from the jail, which included treatment notes by Dr. Homero Sanchez, the psychiatrist treating Appellant in the jail.

In addition, defense counsel presented the testimony of Dr. John Enriquez, a psychiatrist who examined Appellant in August 2012 at the request of the public defender. Enriquez had concluded that Appellant was experiencing a "brief psychotic break," characterized by auditory hallucinations as well as delusional and paranoid thinking. Enriquez was present in the courtroom during Appellant's exchanges with the trial court concerning self-representation. The trial court questioned Enriquez about whether Appellant had the competence to make the decision to represent himself. The doctor observed that Appellant "continued to show signs of a mental disorder" and noted "a lot of ambivalence" and "wavering" by Appellant about whether he wanted to represent himself. Ultimately, Enriquez indicated that Appellant's delusional and paranoid thinking impaired his ability to make "accurate decisions."

After Enriquez testified, the trial court admonished Appellant about "the dangers and disadvantages of self-representation," *see Faretta v. California*, 422 U.S. 806 (1975),

and questioned Appellant about his experience and understanding of legal matters.  The

following exchange occurred toward the end of the admonishments:

THE COURT:     Let -- okay. Let me ask you this question. I think it goes right to the heart of what we're -- we're asking. Are you able to tell me, Mr. Bluntson, today why you don't want a lawyer?

[APPELLANT]:     I don't -- if they've -- if they've not [sic] doing things that's in -- in -- as you stated, they don't just -- they're not just a microphone to repeat what I say.  But if they're not -- if they're not accommodating -- if they're not -- not even accommodating -- if they're not working with me and saying, Hey, let's -- let's take care of this; let's get this going, and they're not doing this for me, and they're doing some of the same things, then they're not working for me.

THE COURT:     All right. Now --

[APPELLANT]:     'Cause I'm not sure --

THE COURT:     Let me ask you this question. Let me ask --

[APPELLANT]:     I don't know, but I don't [know] what they've been doing for me, man.

THE COURT:     Let me ask you this question. Maybe I should have asked you this question first. Are you telling me that you would like a lawyer, but you -- let's answer that question first. Would you like a lawyer?

[APPELLANT]:     Sir --

THE COURT:     We have to ask that question piece -- first -- step by step.

[APPELLANT]:     It -- the way I have to answer is, the attorneys that are appointed to me, if they're not working in my best interest, then I -- I would have to go at it on my own.

THE COURT:     Okay.

[APPELLANT]:     Later on --

THE COURT:     I know that. You've already told me that. You've already told me that. And I --

[APPELLANT]:     (Inaudible) -- they are.

THE COURT:     Mr. Bluntson. Mr. Bluntson. I already know that. You don't have to repeat that to me. I just have to ask you the question. Before I ask the follow-up question I need to ask you, do -- you know you have the right to have a lawyer represent you throughout the process. You know that if you can't afford a lawyer to -- to represent you that one can be appointed to you. You, in fact, had told me at the very beginning that, yes, you do want a lawyer, right?

[APPELLANT]:     Correct.

THE COURT:     Now, today, as we stand here, you're telling me what? You're not telling me specifically that you don't want one. You're saying, I do -- I still want one, "but," right? What are you telling me? You still want one, but what?

                …

[APPELLANT]:     I don't -- I don't feel it. I mean, you know, for me to dismiss and say, Hey, I don't want no lawyer, it's like I -- I can't file the papers I need to. I don't have accesses [sic] to the things that I need to help me defend myself. So, is -- it is a conflicted view --

THE COURT:     That's right.

[APPELLANT]:     -- for me.

THE COURT:     All right.

[APPELLANT]:     It's a conflicted view.

THE COURT:     I understand that. I understand.

[APPELLANT]: Because I -- I don't have access to these things. And these are -- these are my -- this is my law library right here.

THE COURT: That's right.

[APPELLANT]: These are the people that know (pointing), and they're not working in accordance with me.

THE COURT: Record will reflect that Mr. Bluntson's pointing to his counsel.

[APPELLANT]: These -- I'm pointing to these -- Mr. Oscar Pena. I don't know Ms. -- I'm sorry.

THE COURT: Martinez.

[APPELLANT]: I don't know you -- her, as she came to see me yesterday. From what they have done --

THE COURT: All right.

[APPELLANT]: -- Edward and Oscar --

THE COURT: Let's -- let's proceed.

[APPELLANT]: -- or haven't done.

The trial court further admonished Appellant about self-representation, and then

questioned Appellant about his understanding of the admonishments:

THE COURT: Do you understand the risks and disadvantages of representing yourself?

[APPELLANT]: I'm pretty sure that there are risks. And it's why it's conflicting for me because --

THE COURT: I understand.

[APPELLANT] -- there are things that I do not know.

THE COURT:	Okay.

[APPELLANT]:	And it would be wonderful to have an attorney to not one [sic] that will work in accordance with the District Attorney's office. It's still the same thing.

THE COURT:	All right. …

At the end of the hearing, the trial court found that "[Appellant's] issues … that have been described to me by Dr. Enriquez, Dr. Jumes, and whatever I have received also from the jail indicate to me, sir, that I -- that my finding is that you do not have the capacity to represent yourself." The court informed Appellant that appointed counsel would continue to represent him.

*Substitute Counsel*

In point of error seventeen, Appellant asserts that the trial court violated the Sixth, Eighth, and Fourteenth Amendments by not replacing appointed counsel despite his "repeated and valid complaints." He argues that the trial court was aware of the "intense conflict" between himself and his appointed counsel but failed to adequately inquire whether the conflict warranted the appointment of new counsel.

Appellant never filed a formal request for substitute counsel; he filed no motion, nor did he send a letter to the judge. He simply asked the court at the December 2012 pretrial hearing—his first court appearance with appointed counsel—if he "could have a lawyer outside of this region" because of "discouraging remarks" counsel had made at their first meeting. The trial court declined to grant that request given that counsel's representation had just started. The court encouraged Appellant to communicate with his attorneys, and Appellant agreed to work with them. He did not object to the trial court's

decision not to appoint replacement counsel at that time. Thereafter, although Appellant repeatedly complained about the process and his counsel, he never again explicitly requested substitute counsel.[22] Despite Appellant's failure to obtain a ruling from the trial court on a formal request for substitute counsel, we will assume without deciding that he sufficiently preserved for appellate review his complaint about the trial court's failure to replace his appointed counsel.

Once the trial court has appointed an attorney to represent an indigent defendant, the defendant has been afforded the constitutional protections regarding the right to counsel. *Malcom v. State*, 628 S.W.2d 790, 791 (Tex. Crim. App. 1982). A defendant is not entitled to appointed counsel of choice. *Dunn v. State*, 819 S.W.2d 510, 520 (Tex. Crim. App. 1991). Further, a trial court has no duty to search for counsel who is agreeable to the defendant. *King v. State*, 29 S.W.3d 556, 566 (Tex. Crim. App. 2000). A defendant is required to accept appointed counsel unless he sufficiently demonstrates why substitute counsel is necessary. *See Hill v. State*, 686 S.W.2d 184, 187 (Tex. Crim. App. 1985).

If a defendant is dissatisfied with his appointed counsel, he bears the burden of proving he is entitled to a change of appointed counsel. *Hill*, 686 S.W.2d at 187; *Malcom*, 628 S.W.2d at 791; *see* Art. 26.04(j)(2) (authorizing removal of appointed

---

[22] Appellant acknowledges that he "did not repeat his desire for alternative counsel as frequently as he did his requests to represent himself." In fact, Appellant's request for counsel "outside the region" was the only explicit request that Appellant made for different counsel. Arguably, Appellant indirectly requested different counsel at the hearing on his self-representation request when he asserted that he wanted the assistance of counsel who would "work for him" while simultaneously complaining about appointed counsel's representation.

counsel after finding of "good cause").  Generally, conclusory allegations of conflicts of interest, disagreements on trial strategy, and personality conflicts are insufficient to satisfy the defendant's burden.  *King*, 29 S.W.3d at 566.  We review the trial court's ruling on replacing counsel for an abuse of discretion.  *Id.*

Appellant contends that his repeated complaints about counsel and his unwillingness to communicate with them demonstrated a breakdown in the attorney-client relationship that constituted a conflict.  This alleged conflict, he maintains, was "good cause" for switching counsel, but the trial court did not adequately investigate it.  However, Appellant's repeated complaints about counsel failed to advance a valid basis for conflict.  *See Calloway v. State*, 699 S.W.2d 824, 830–31 (Tex. Crim. App. 1985) (declining to find that trial court neglected its duty to hold hearing when motion to withdraw did not advance valid basis for asserted conflict).  Appellant's repeated statements—that counsel made discouraging remarks, that counsel did not adopt his pro se pleadings, and that counsel were "not working in accordance with [him]"—were not valid grounds for removal.  *See, e.g.*, *King*, 29 S.W.3d at 566 (holding that trial court did not abuse its discretion in refusing counsel's motion to withdraw when defendant and his attorney had "personality conflicts" and defendant complained about counsel's trial strategy and failure to provide updates about his case).  Under the circumstances, the trial court was not required to take further steps to ascertain the extent of the alleged conflict.

Moreover, Appellant had multiple opportunities to express his dissatisfaction with counsel and to explain the perceived conflict.  Although he repeatedly expressed dissatisfaction with his attorneys, he failed to expand on his reasons for dissatisfaction

and simply asserted that they "weren't his lawyers" and that he refused to work with them. *See, e.g.*, *King*, 29 S.W.3d at 565–66 (concluding that, when hearing on motion to withdraw gave defendant opportunity to expand on his reasons for dissatisfaction with counsel, but he failed to do so, trial court did not abuse its discretion in denying motion). Notably, defense counsel did not, at any time, ask to withdraw or state that a conflict of interest might impair their representation of Appellant. *See Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980) ("[T]rial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel.").

Appellant had the burden to show that he was entitled to a change in counsel, and he did not. The record shows that Appellant's complaints reflected personality conflicts or disagreement with trial strategy—which were not valid grounds for dismissal and did not constitute an actual conflict of interest. *See, e.g.*, *Viges v. State*, 508 S.W.2d 76, 76–77 (Tex. Crim. App. 1974) (concluding that court did not err in denying motion for counsel to withdraw when trial court held conference with defendant and defense counsel, but only reasons urged for withdrawal were defendant's refusal to cooperate and his desire not to be represented by that attorney); *see also Green v. State*, 840 S.W.2d 394, 408 (Tex. Crim. App. 1992) (observing that "the right to counsel may not be manipulated so as to obstruct the judicial process or interfere with the administration of justice"). On this record, Appellant has not shown that the trial court abused its discretion in failing to replace his appointed counsel. We overrule point of error seventeen.

**B.** *Self-Representation*

In point of error twelve, Appellant asserts that the trial court violated his Sixth and Fourteenth Amendment rights by denying his request to represent himself.

The Sixth Amendment guarantee of the assistance of counsel also encompasses the reciprocal right to self-representation. *Faretta*, 422 U.S.at 818; *Williams v. State*, 252 S.W.3d 353, 356 (Tex. Crim. App. 2008). However, while the right to counsel is in effect until waived, the right to self-representation does not attach until it has been clearly and unequivocally asserted. *Osorio-Lopez v. State*, 663 S.W.3d 750, 756 (Tex. Crim. App. 2022); *see Faretta*, 422 U.S. at 818, 835. To proceed pro se, a defendant must "knowingly and intelligently" waive his right to counsel. *Faretta*, 422 U.S. at 835. If a defendant properly asserts his right to self-representation, the trial court must inform the defendant about "the dangers and disadvantages of self-representation," so that the record establishes that he knowingly and intelligently waives his right to counsel. *See Faretta*, 422 U.S. at 835; *Williams*, 252 S.W.3d at 356. A defendant need not have the skill and experience of a lawyer "to competently and intelligently choose self-representation." *Faretta*, 422 U.S. at 835; *Osorio-Lopez*, 663 S.W.3d at 756. The focus is on whether the defendant is competent to choose to proceed pro se, not whether he is equipped to represent himself at trial. *Osorio-Lopez*, 663 S.W.3d at 756.

But even where a defendant is competent to choose to represent himself, the right to self-representation is not absolute. *Id.*; *see Indiana v. Edwards*, 554 U.S. 164, 174–78 (2008). The United States Supreme Court has recognized a "mental-illness-related limitation on the scope of the self-representation right." *Chadwick v. State*, 309 S.W.3d 558, 561 (Tex. Crim. App. 2010); *see Edwards*, 554 U.S. at 178. For those individuals

who are competent to stand trial but "who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves," the Constitution allows states to insist upon representation by counsel. *Edwards*, 554 U.S. at 178; *see Osorio-Lopez*, 663 S.W.3d at 756. The trial judge is in the best position to determine whether a mentally ill defendant is competent to proceed pro se. *Edwards*, 554 U.S. at 177; *Chadwick*, 309 S.W.3d at 561. Thus, the trial court's determination is a mixed question of law and fact, and we review the court's decision for an abuse of discretion. *Chadwick*, 309 S.W.3d at 561 (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)).

As an initial matter, we note that, based upon the totality of circumstances shown by the record, particularly Appellant's "ambivalence," "wavering," and "conflicted view" about representing himself, the trial court could reasonably have concluded that Appellant did not "clearly and unequivocally" invoke his right to self-representation. Nevertheless, because the trial court proceeded with the hearing on Appellant's request to represent himself, we will assume without deciding that Appellant sufficiently asserted his right to self-representation.

Appellant argues that the trial court's reference to Appellant's "issues" when finding him incompetent to represent himself failed to determine that Appellant suffered from a "severe mental illness." He acknowledges that we have upheld the making of implied findings to support a trial court's determination that a defendant's mental illness was severe enough to render him incompetent to proceed pro se. *See Chadwick*, 309 S.W.3d at 562. However, he suggests that because neither the parties nor the trial court

explicitly stated that he suffered from a "severe mental illness" or used that phrase when describing him, the trial court failed to apply the *Edwards* "severe mental illness" standard. We disagree. Simply because the trial judge did not specifically articulate on the record the precise nature of Appellant's "issues" does not mean that the judge failed to apply the correct "severe mental illness" standard.[23]

The test for competence to stand trial is not alone the test for competence to represent oneself at trial. *See Edwards,* 554 U.S. at 175–76 (noting complexities involved with mental illness and that "[i]n certain instances an individual may well be able to satisfy *Dusky'*s mental competence standard, for he will be able to work with counsel at trial, yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel"). And, when determining a defendant's ability to represent himself, the trial judge presiding over the proceedings "will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Edwards*, 554 U.S. at 177.

In this case, the trial judge had multiple opportunities to observe and interact with Appellant. In addition, the evidence at the self-representation hearing demonstrated that Appellant suffered from multiple symptoms of psychosis—auditory hallucinations, delusional thinking, and paranoid thinking—that impaired his mental capacity. *See id.* at

---

[23] In his supplemental brief, Appellant "revisits" this point of error, arguing that the trial court's comments during the retrospective competency proceedings demonstrate that it did not apply the correct standard when making its ruling. We decline to import the trial court's comments made during the retrospective competency proceeding to actions taken seven years before. Moreover, we disagree that the comments demonstrate that the trial court failed to apply the "severe mental illness" standard.

176 (recognizing "common sense of [the] general conclusion" that "[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant"). This evidence, combined with the court's experience with Appellant, allowed the trial court "to take realistic account of [Appellant's] mental capacities." *See id.* at 177.

The record in this case supports the trial court's implied finding that Appellant suffered from mental illness severe enough to render him incompetent to waive counsel or represent himself, even though competent to stand trial. *See Chadwick*, 309 S.W.3d at 562. Therefore, we conclude that the trial court did not abuse its discretion in denying Appellant's request to proceed pro se. We overrule point of error twelve.

## C. *Self-Representation Hearing*

In point of error thirteen, Appellant contends that the trial court erred in failing to ensure that he received adequate representation at the self-representation hearing, which violated his Sixth Amendment right to counsel.[24]

Relying on a defendant's right to counsel at competency proceedings, *see* Art. 46B.006(a); *Estelle v. Smith*, 451 U.S. 454, 469 (1981), Appellant asserts that counsel "failed to function as advocates for [him] with regard to the self-representation question"

---

[24] Most of point of error thirteen complains of the trial court's failure to ensure adequate representation during the competency proceedings. However, the remand for the retrospective competency trial has rendered that portion of this point of error moot.

but instead "became his adversaries." He contends that, by taking a position adverse to his wishes, counsel limited his right to self-representation.

But the Constitution allows for limits on the right to self-representation, in some circumstances, of those who are mentally ill. *See Edwards*, 554 U.S. at 178. Furthermore, to relinquish the right to counsel, a defendant must knowingly and intelligently waive that right. *Faretta*, 422 U.S. at 835. If the waiver is not knowingly and intelligently made, it is invalid. *See id.*; *Williams*, 252 S.W.3d at 358. "An invalid waiver waives nothing." *Osorio-Lopez*, 663 S.W.3d at 756 (quoting *Williams*, 252 S.W.3d at 358).

What Appellant suggests is that his appointed counsel were required to promote a waiver they believed to be invalid. He criticizes his counsel for presenting evidence to "defeat" their own client's request to represent himself. However, he cites no law, constitutional or statutory, that requires appointed counsel—who believe that severe mental illness renders their client incompetent to waive counsel and represent himself—to withhold evidence demonstrating that incompetence from the trial court. Nor does Appellant point to any authority that requires counsel in this position to advocate for their client's right to proceed pro se notwithstanding their belief that a waiver of counsel is invalid. In fact, what Appellant suggests his counsel were required to do could itself be an act that violates the Sixth Amendment right to counsel. *See Williams*, 252 S.W.3d at 358 (allowing defendant to represent himself "without a valid waiver of the right to counsel" denies that defendant of right to counsel). Finally, the Supreme Court has already held that the Constitution allows trial courts "to insist upon representation by

counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Edwards*, 554 U.S. at 177-78. We overrule point of error thirteen.

*Right to Autonomy of Defense Objective*

In point of error sixteen, Appellant argues that his trial counsel violated his Sixth Amendment right to autonomy of his defense objective by conceding his guilt during trial. He notes his plea of "not guilty," and cites to various statements made by his trial counsel during voir dire, opening statements, and closing arguments.

At the beginning of jury selection, trial counsel told the venire panel that "in this particular case, we will be dealing more with the appropriate punishment rather than the guilt or innocence of the defendant. This is more a case about whether the death penalty will be imposed or not. It's of the circumstances under which the crime occurred." Counsel also mentioned that they would not be raising an insanity defense, and they expected to introduce evidence of mental illness for purposes of mitigation against the death penalty. Appellant did not object to these remarks.

On the first day of individual jury selection, outside the presence of any venire member, trial counsel approached the trial court to discuss deposing Appellant's mother and brother. The prosecutor voiced concerns about the timing of the deposition, indicating that the questions the State would propound to Appellant's mother would depend on what transpired at trial.[25] Defense counsel told the court that "it's unrealistic

---

[25] Specifically, the prosecutor said that if Appellant was found guilty, "the line of questions would be very different to Ms. Bluntson than they would be" before such a finding.

to expect that [Appellant] will not be found guilty, Your Honor. This case is really about punishment." Counsel further informed the court, "We really don't have a defense to the charges." Appellant then said, "I would like to represent myself, for the record."

During opening statements, trial counsel acknowledged that "the crimes alleged in the indictment are senseless, horrific, atrocious crimes, and … they have caused enormous pain to the Thompson, Cerny, as well as to the Bluntson family." Counsel conveyed "sincere sympathy to the families." Counsel then reminded the jury that "every person accused of a crime has the right under both the state and federal Constitutions, as well as under the Code of Criminal Procedure, to demand that the State prove each and every element of each offense alleged in the indictment by competent proof beyond a reasonable doubt." Counsel concluded by telling the jury, "I don't expect that the evidence will show why [D.B.] and [J.T.] were murdered. The only explanation is that their murders were the product of a person with a very severe mental illness." The prosecutor objected to counsel's comment, and the court sustained the objection. Appellant then interjected:

| [APPELLANT]: | For the jury, I am testifying. Dismiss everything that he said 'cause to me it's about [J.T.] -- |
| --- | --- |
| THE COURT: | Mr. Bluntson. |
| [APPELLANT]: | -- and [D.B.] That's it. |
| THE COURT: | Mr. Bluntson. You will not be able to address the jury from that particular area. |

The jury then left the courtroom for lunch, and the trial court admonished Appellant about interrupting the proceedings. During the exchange, Appellant told the court:

The only reason I spoke up because he -- I was not in agreeance [sic] with his opening statements to the jury. It's not about me. I don't care about me. I care about [J.T.] and [D.B.], which I will speak on. Everything that the [District Attorney] just said, like I said before, they are gonna have to stand behind it. And you want me to be quiet, and just let everybody do whatever they want to do now. For me to be quiet, I don't talk to [appointed counsel]. I don't deal with them. They don't represent anything that I want.

The trial resumed after lunch with the start of testimony. During the testimony of the second witness, the front desk clerk from the hotel, Appellant interrupted the proceedings by repeatedly blurting, "You're lying." When the court admonished Appellant about his interruptions and warned him that he would be removed from the courtroom, Appellant indicated that he "[couldn't] sit up here and let them lie." He repeatedly asserted that the witness and the District Attorney were lying and said, "This is about [J.T.] and [D.B.], I promise you --" and stated that "[t]he truth gonna come out no matter what." The trial court removed Appellant from the courtroom, advising him that he would be able to observe the proceedings from another location and could advise the court if he wished to speak with his lawyers. Appellant responded saying, repeatedly, "They're not my lawyers."

On the second day of testimony, Appellant was again present in the courtroom. During the testimony of Officer Esteban Reyes, Appellant once more interrupted the proceedings by again blurting, "You're lying." Appellant then repeatedly said that he could not sit here "while they lie" and stated that "the truth is going to come out." He was removed from the courtroom. Later, after the lunch break, the court gave the Appellant the opportunity to return to the courtroom. He refused, indicating that he

would "not sit here and be quiet." He asked to be allowed to ask the witnesses questions directly because he "[didn't] deal with them," referring to his attorneys.

The record reflects that Appellant was not present in the courtroom for the trial proceedings on the third day of testimony. On the fourth and last day of testimony in the guilt phase, Appellant was again present in the courtroom. During the medical examiner's testimony about the results of D.B.'s toxicology analysis, Appellant once again interrupted the proceedings with outbursts accusing the doctor of lying. Appellant was again removed from the courtroom. The court took a break after the medical examiner's testimony and brought Appellant back into the courtroom. He remained in the courtroom for the testimony of the remaining witnesses (the medical examiner who conducted J.T.'s autopsy and a firearms expert), causing no further interruptions. The State rested, and the jury was released for lunch.

During the lunch break, defense counsel questioned Appellant on the record about whether he wanted to testify. Appellant said that he did. The trial court informed Appellant that his testimony would have to proceed in question-and-answer form, refusing to allow Appellant to testify in narrative form. Defense counsel stated on the record that they disagreed with Appellant's decision to testify. Counsel also made a suggestion of incompetency, to which Appellant responded that there was "no need for that" and "[w]e're gonna stick with the trial." The State countered that Appellant was not incompetent to stand trial but was instead "belligerent," as demonstrated by Appellant "having strategically decided when to interrupt the proceedings." Appellant asserted that he was "defiant to everything that y'all have done."

After the lunch break, the court revisited whether Appellant wanted to testify. Based on caselaw presented by defense counsel during the break, the trial court agreed to allow Appellant to testify in narrative form. But Appellant declined to testify, saying that, while his "ultimate goal was to testify," he did not "want to be held down here any longer" and wanted "to finish this process. So that way, we can move on. … So, there is no defense. We rest."

During closing argument, Appellant's trial counsel challenged the State's argument that Appellant acted with premeditation:

> If Mr. Bluntson wanted to kill those children, he could have done so at any of those locations -- from El Campo, Texas, all the way down to Laredo. Instead, you saw the Walmart video. He was buying them toys, power vehicles, Snickers, pineapple juice. I mean, does that show the actions of someone who -- who was planning on killing these kids?

Counsel further argued that the evidence refuted that Appellant had the requisite *mens rea* and instead showed that he did *not* act intentionally or knowingly because he was mentally ill, which counsel suggested the jury could infer, in part, from Appellant's behavior in the courtroom:

> Unfortunately, the horrific crimes did occur here in Laredo. And they occurred here in Laredo after police used a master key to unlock the door and to cut the chain to Room 1408. What type of person would commit these type of crimes? Not someone like you or me. Someone whom you have witnessed in this courtroom behave in an irrational manner to the point where he had to be excluded from the courtroom.
>
> Put that type of person, whose behavior you witnessed, put that type of person on the other side of the hotel room door, with police literally knocking down that door trying to gain entrance, feeling trapped under that much stress. I mean, was that an intentional and knowingly -- an -- an intentional action to do that, with that type of mind frame, with everything that's going on? Doesn't think as normal as you and me.

…

Nonetheless, nonetheless, these horrible crimes occurred. And they occurred under the circumstances that you heard about this week.
…

Well, we submit to you that you can base on the inferences from all the evidence, and you can reasonably infer from the trajectory of the bullet that Mr. Bluntson tried to kill himself by placing the barrel of the gun to his head and trying to shoot himself in the head but instead, the bullet hitting [sic] the ceiling. The trajectory of the bullet fired was in an upward direction consistent with the wound in his head.

What type of person are we dealing with in Mr. Bluntson? What type of person are we dealing with with [sic] -- in Mr. Bluntson. A person who tried to kill himself in Room 1408 at the Holiday Inn. A person who refuses to talk to his attorneys, knowing what's at stake. A person whose behavior you witnessed in this courtroom. A person who is accused of unthinkable crimes by the nature of the crimes themselves. We're not dealing with a normal person here. You can make inferences. From everything you've seen here and observed this -- this week, you can -- you can make inferences.

And there is no explanation for this. I agree. I agree with [the District Attorney] that there is no explanation for this crime. But you can make inferences and realize that only a mentally ill person would commit -- this type of offense.

Appellant did not object to any of counsel's remarks during closing argument.

Appellant now asserts on appeal that his trial counsel's "guilty but mentally ill" defense violated his right to autonomy of his defense objective.

In *McCoy v. Louisiana*, the United States Supreme Court held that a criminal defendant has a Sixth Amendment right of autonomy "to decide that the objective of the defense is to assert innocence." 584 U.S. 414, 422 (2018). The court held that the Sixth Amendment guarantees to a defendant "the right to insist that counsel refrain from admitting guilt, even when counsel's experience-based view is that confessing guilt offers

the defendant the best chance to avoid the death penalty." *Id.* at 417. Therefore, "[w]hen a client expressly asserts that the objective of '*his* defence' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." *Id.* at 423. The court explained that maintaining one's innocence is an objective of representation, not merely an issue of trial tactics, and thus is a decision reserved for the client, not the attorney. *See id.* at 422.

But *McCoy* addressed whether defense counsel could concede guilt when "the defendant vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt." *See id.* at 417. The record showed that McCoy's counsel conceded guilt over McCoy's "intransigent and unambiguous objection." *See id.* at 420. Similarly, in *Turner v. State*, we concluded that the defendant "made express statements of his will to maintain his innocence." *See* 570 S.W.3d 250, 276 (Tex. Crim. App. 2018). The *Turner* record further showed that trial counsel were aware that their trial strategy of conceding guilt was against Turner's wishes. *See id.* Accordingly, we overturned Turner's conviction. *See id.*

Such is not the case here. On the many occasions that Appellant addressed the trial court to complain about his appointed counsel or the proceedings, Appellant only asserted global complaints: he disagreed with counsel's opening statement to the jury and protested that his attorneys "weren't working for [him] and "[didn't] represent anything [he] want[ed]." The record does not show that, at any point, Appellant indicated—to his attorneys or the trial court—that he did not fatally shoot the children. Nor does the record show that he expressed—to his attorneys or the trial court—his

desire to maintain his innocence. His trial counsel's implied concession was repeated at different stages throughout trial, but Appellant did not object in any of those instances specifically to the concession of guilt nor did he express that counsel were conceding his guilt contrary to his desire to maintain innocence.[26] Appellant had multiple opportunities to assert a *McCoy* complaint, but he did not.

We have explained that "a defendant cannot simply remain silent before and during trial and raise a *McCoy* complaint for the first time after trial"; he must "present[ ] 'express statements of [his] will to maintain innocence.'" *Id.* at 276 (quoting *McCoy*, 584 U.S. at 424); *see Ex parte Barbee*, 616 S.W.3d 836, 845 (Tex. Crim. App. 2021) (observing that *McCoy* requires "a defendant's express objections to a concession of guilt disregarded by counsel and court and aired before a jury during trial"). Although Appellant pleaded not guilty and expressed global disagreement with counsel's opening statement and representation, he did not object to his counsel's statements impliedly conceding guilt, did not inform the trial court of his disagreement with his counsel's concession trial strategy, or otherwise express dissatisfaction with the concession of guilt. *See Turner*, 570 S.W.3d at 276 ("A defendant makes a *McCoy* complaint with sufficient clarity when he presents 'express statements of [his] will to maintain innocence'") (quoting *McCoy*, 584 U.S. at 424).

---

[26] We note that most of counsel's comments did not directly concede guilt or explicitly assert that Appellant fatally shot the children, but instead implied it. Further, counsel impliedly conceded only the *actus reus* while consistently contesting the *mens rea*. *See McCoy*, 584 U.S. at 424 (explaining that although counsel could not interfere with McCoy's telling the jury he was not the murderer, "counsel could, if consistent with providing effective assistance, focus his own collaboration on urging that McCoy's mental state weighed against conviction").

Even if we assume that trial counsel's implicit concession of the *actus reus* conceded guilt as Appellant alleges, this case is factually distinguishable from *McCoy* and *Turner*.  In those cases, the record clearly established that trial counsel acted contrary to the client's express wishes.  Conversely, the record here does not demonstrate that Appellant maintained his innocence consistently.  Nor does it show that he expressed his desire to maintain his innocence or expressed that maintaining innocence was his defense objective, to either his attorneys or the trial court.  The unique circumstances present in *McCoy* and *Turner* are not present in this case.

Moreover, "[i]f a client declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy [he] believes to be in the defendant's best interest." *McCoy*, 584 U.S. at 424.  The record reflects that Appellant repeatedly refused to communicate or work with his attorneys, so counsel was permitted to pursue the "guilty but mentally ill" strategy about which Appellant now complains.

We overrule point of error sixteen.

## IV.   Speedy Trial

In point of error twenty-three, Appellant claims that the trial court erred by failing to grant his pro se motion for a speedy trial.  *See* U.S. CONST. amend. VI.

Appellant requested a speedy trial in a pro se motion filed in April 2013, and orally urged his motion at a pretrial hearing in May 2013.  Thereafter, Appellant repeatedly mentioned his right to a speedy trial, or his invocation of it, at subsequent pretrial hearings, at one point complaining that his right to a "speedy trial to Houston" was being "trampled over."  The trial court repeatedly told Appellant that the matter was

one he needed to discuss with his attorneys. Appellant's counsel did not file a motion for speedy trial, nor did they adopt or re-urge Appellant's motion. The trial court did not rule on Appellant's pro se motion.

A defendant has no right to hybrid representation. *Robinson v. State*, 240 S.W.3d 919, 922 (Tex. Crim. App. 2007); *see Jenkins v. State*, 592 S.W.3d 894, 902 n.47 (Tex. Crim. App. 2018). Therefore, a trial court is free to disregard any pro se motions presented by a defendant who is represented by counsel. *Robinson*, 240 S.W.3d at 922.

Because Appellant was represented by counsel, and counsel did not adopt or urge Appellant's pro se motion, the trial court did not abuse its discretion in not ruling on Appellant's pro se motion for speedy trial.[27] *See Tracy v. State*, 597 S.W.3d 502, 509 (Tex. Crim. App. 2020) (rejecting Appellant's argument that death penalty cases require hybrid representation and holding that trial court did not err in disregarding pro se motions presented by Appellant). We overrule point of error twenty-three.

## V. Motion to Suppress

After the police entered Room 1408 and secured Appellant, they took him to the hospital, where his clothing was confiscated. Police found Brandy's driver's license and Visa debit card in his pants pockets. Meanwhile, inside the hotel room, police recovered four bullet casings and two bullet slugs consistent with being fired from the handgun in the room, containers of pain medication, beer cans, marijuana, and a set of keys that

---

[27] Appellant acknowledges that he has no right to hybrid representation but argues that because the trial court erred in denying his request to represent himself, the trial court also erred in not ruling on his pro se motion. However, we have concluded that the trial court did not err in denying Appellant's self-representation request.

belonged to the Jeep Liberty that Appellant drove to Laredo. The evidence showed that Brandy was the registered owner of the Jeep Liberty. Inside the Jeep, which was in the hotel parking garage, police found Brandy's purse and personal belongings, more beer cans, and more marijuana. Children's toys and books were found in both the hotel room and the Jeep. Items seized from the hotel room and the Jeep were admitted at Appellant's trial.

Appellant filed a pretrial motion to suppress evidence, asserting that the police entry into the hotel room and the Jeep violated his right to be free from unreasonable search and seizure under the Fourth Amendment of the United States Constitution and Article I, Section 9, of the Texas Constitution. Therefore, he maintained, the admission of the seized evidence would deny him due process under the Fifth, Sixth, and Fourteenth Amendments and due course of law under Article I, Sections 10 and 19, and would violate Articles 1.05 and 38.23 of the Texas Code of Criminal Procedure.

The trial court conducted a pretrial hearing on the motion. Appellant argued that the police entered Room 1408 "without a warrant, without probable cause, and without consent, in violation of [his] Fourth Amendment right to privacy" because the police entered the hotel room before his occupancy had ended (since the first attempted entry was before noon, the hotel checkout time) and the hotel had not begun any type of eviction. The State contended that Appellant lacked standing to challenge the constitutionality of the searches of either the hotel room or the Jeep because he did not have a legitimate expectation of privacy. Specifically, the State argued that Appellant's possession of the hotel room and Jeep were unlawful because he had fraudulently secured

the room and did not have Brandy's permission to possess or drive her Jeep. The State alternatively argued that the warrantless entry into the hotel room was justified under the emergency doctrine. *See Laney v. State*, 117 S.W.3d 854, 861 (Tex. Crim. App. 2003) (explaining that emergency doctrine deals with warrantless entries made when police are acting in their limited community caretaking role of protecting or preserving life or avoiding serious injury).

At the hearing, the testimony of the State's witnesses established the facts detailed earlier in this opinion, which, for the most part, are not in dispute. Appellant did not call any witnesses. At the conclusion of the hearing, the trial court denied the motion to suppress. The court subsequently entered written findings, adopting the State's proposed findings of fact and conclusions of law. The court concluded that Appellant lacked a reasonable expectation of privacy in the Jeep Liberty, that the warrantless entry into the hotel room was valid under the emergency doctrine, and, alternatively, that Appellant did not have a reasonable expectation of privacy in the hotel room that he fraudulently procured.

In point of error nineteen, Appellant contends that the trial court erred in denying his motion to suppress the evidence seized from the hotel room and the Jeep. He argues that police entered the room, and later the Jeep, without a valid search warrant and that no exception to the warrant requirement applied.

"[T]he application of the Fourth Amendment depends on whether the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735,

740 (1979) (internal quotation marks omitted). A person alleging a Fourth Amendment violation "must have a cognizable Fourth Amendment interest" in the place being searched—a concept known as "Fourth Amendment standing." *Byrd v. United States*, 584 U.S. 395, 410 (2018). One challenging a search has the burden of proving facts demonstrating a legitimate expectation of privacy in the place searched. *King v. State*, 670 S.W.3d 653, 656 (Tex. Crim. App. 2023). To meet this burden, the challenger must demonstrate that: (1) by his conduct, he exhibited an actual subjective expectation of privacy in the place searched, and (2) under the circumstances, society is prepared to recognize his subjective expectation as objectively reasonable. *Smith*, 442 U.S. at 740; *King*, 670 S.W.3d at 656; *see Granados v. State*, 85 S.W.3d 217, 223 (Tex. Crim. App. 2002) (providing non-exhaustive list of circumstances courts consider when determining whether defendant has demonstrated reasonable or legitimate expectation of privacy).

The United States Supreme Court has explained that "[l]egitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Byrd*, 584 U.S. at 405 (quoting *Rakas v. Illinois*, 439 U.S. 128, 144 n.12 (1978)). The court has also made clear that "'wrongful' presence at the scene of a search would not enable a defendant to object to the legality of the search." *Id*. at 409 (quoting *Rakas*, 439 U.S. at 141 n.9). Thus, "the general rule … is that the defendant must establish that he had permission to be on the premises on the occasion of the search at issue." *Granados*, 85 S.W.3d at 225; *see* 6 Wayne R. LaFave, *Search and Seizure* § 11.3(b) (6th ed. 2022) (stating that "[t]he burden is on the defendant

to establish that his presence was not wrongful").

The question here is whether Appellant's claim of an expectation of privacy in the hotel room or the Jeep Liberty is reasonable considering all the surrounding circumstances. *See Rakas*, 439 U.S. at 152. We conclude that it is not. *See King*, 670 S.W.3d at 656 (explaining that whether defendant has standing to contest search and seizure is question of law reviewed *de novo*). Appellant's attempts to establish a privacy interest in either the hotel room or the Jeep are unavailing.

At the suppression hearing and at trial, Appellant argued that he maintained an expectation of privacy in the hotel room. He reasoned that when the police first intruded into the hotel room (when the desk clerk first used the master key to unlock the door but encountered the latched security chain), his occupancy had not yet ended. After all, he asserted, the attempt to enter was before noon, which was the hotel's checkout time, and the hotel had not begun any type of eviction process. *See Tilghman v. State*, 624 S.W.3d 801, 807 (Tex. Crim. App. 2021) (explaining that hotel guests lose expectation of privacy in room at time occupancy is scheduled to end or upon eviction from room by hotel). Appellant relies on these same facts and arguments on appeal. But we conclude that Appellant failed to show, regardless of the timing of the intrusion and the absence of an eviction, that he had a legitimate expectation of privacy.

Hotel guests are entitled to the constitutional protections against unreasonable searches and seizures in the rooms that they let. *Tilghman*, 624 S.W.3d at 806–07; *see Stoner v. California*, 376 U.S. 483, 490 (1964). But Appellant presented no evidence showing that *he* was a registered guest of Room 1408 and therefore had a legitimate

expectation of privacy in the room.  While Appellant obtained the hotel room, he did so fraudulently by using Brandy's name, her identification, and her debit card, and by signing with her initials, to register *her* as the hotel guest.  And Appellant presented no evidence showing that he had Brandy's permission to use her name, identification, and debit card, or to sign on her behalf, to secure the room.  In fact, the evidence showed that, at the time that Appellant secured the room, Brandy was deceased and could not give such permission.  Nor did Appellant present any evidence showing that he was present in the hotel room with Brandy's permission (the permission of the registered guest).  Again, the evidence showed that Brandy was deceased and could not give permission for Appellant to be present as a guest in the room registered to her.

Appellant acknowledges his fraud but argues, as he did at trial, that when the police forced entry into the hotel room, they did not know that Brandy was deceased or that Appellant had fraudulently used her name, identification, debit card, and signature to secure the room.  But whether Appellant had a legitimate expectation of privacy does not depend on what the police knew.  *See* 6 Wayne R. LaFave, *Search and Seizure* § 11.3(e) (6th ed. 2022) (explaining that "standing depends upon [a person's] justified expectation of privacy, and this is not determined upon the basis of what the police believe or even necessarily upon the actual facts").  The fact that when police entered the room, they did not yet know that Appellant had secured possession of the hotel room through his criminal conduct, matters not.  *See, e.g.*, *United States v. Cunag*, 386 F.3d 888, 894–95 (9th Cir. 2004) (observing that defendant who procured hotel room "through deliberate and calculated fraud … was not a lawful occupant" and fact that hotel temporarily

succumbed to defendant's fraud by accepting credit card "does not alter the answer to the question of whether he was legitimately on the premises").

It is clear from the evidence that Appellant's acquisition of the hotel room resulted from his criminal conduct. *See* TEX. PENAL CODE §§ 32.51 (Fraudulent Use of Identifying Information), 32.31 (Debit Card Abuse). Appellant conceded as much at the suppression hearing and at trial and acknowledges this on appeal. Because the undisputed evidence showed that Appellant fraudulently procured the room, his presence in the room was unlawful.

This Court has never held that an asserted privacy interest acquired through criminal conduct is one that society is prepared to recognize as objectively reasonable, and we decline to do so today. We note that other jurisdictions have rejected the idea that one can establish a justifiable, reasonable, or legitimate expectation of privacy through criminal conduct. *See, e.g.*, *United States v. Wai-Keung,* 845 F.Supp. 1548, 1563 (S.D. Fla. 1994) ("Society should not recognize an expectation of privacy in a hotel room obtained fraudulently [through use of an unauthorized or counterfeit credit card], and we do not believe that such an expectation is legitimate or reasonable."), *aff'd,* 115 F.3d 874 (11th Cir. 1997); *see also, e.g.*, *United States v. Johnson*, 584 F.3d 995, 1001–002 (10th Cir. 2009) (concluding that when defendant used stolen identification to enter into rental agreement for storage unit, expectation of privacy asserted in storage unit was "not a legitimate expectation of privacy that society is prepared to honor"); *United States v. Caymen*, 404 F.3d 1196, 1200 (9th Cir. 2005) (concluding that Fourth Amendment does not protect against warrantless search of computer purchased with stolen credit card

because "regardless of whether [defendant] expects to maintain privacy in the contents of the stolen property, such an expectation is not one that 'society is prepared to accept as reasonable'").  Thus, while the evidence showed that Appellant may have had a subjective expectation of privacy in Room 1408—particularly given his attempts to barricade himself and the boys inside the room—we cannot conclude that his subjective expectation of privacy is one that society is prepared to recognize as objectively reasonable under the circumstances.

As for the Jeep, Appellant argues that there was "no denial of [Appellant's] ownership, [and] no evidence to demonstrate that he was not an authorized driver."  But Appellant had the burden of proving facts to show standing.  *See King*, 670 S.W.3d at 656.  The undisputed evidence showed that Brandy was the Jeep's registered owner; therefore, the evidence did in fact refute Appellant's ownership.  So, Appellant had the burden to show that he was an authorized driver.  He did not.  While the evidence showed that Appellant drove the Jeep from El Campo to Laredo and into the Holiday Inn parking garage (the possession upon which Appellant relies), Appellant presented no evidence showing that he was driving the Jeep (or possessing it) with Brandy's permission.  In fact, the evidence showed that Brandy was deceased and could not give such permission.  As with the hotel room, Appellant's possession of Brandy's Jeep resulted from his criminal conduct.  *See* TEX. PENAL CODE § 31.07 (Unauthorized Use of Vehicle).  Because the evidence showed that Appellant used Brandy's Jeep without her authorization, he failed to demonstrate a legitimate expectation of privacy in it.  *See Byrd*,

584 U.S. at 409 (observing that "[n]o matter the degree of possession and control, the car thief would not have a reasonable expectation of privacy in a stolen car").

When viewed in the light most favorable to the trial court's ruling, no evidence showed that Appellant had any legitimate property or possessory interest in Room 1408. Likewise, no evidence showed that Appellant had any legitimate property or possessory interest in the Jeep. Rather, the evidence from the suppression hearing and during trial established that Appellant's possession of both the hotel room and Brandy's Jeep was by virtue of his criminal conduct. Therefore, whatever subjective expectation of privacy Appellant may have had in the hotel room or the Jeep, it was not one that society is prepared to recognize as objectively reasonable. *See, e.g.*, *United States v. Vega*, 221 F.3d 789, 797 (5th Cir. 2000) (explaining that "the burglar's expectation of privacy loses its legitimacy … because of the wrongfulness of his presence in the place where he purports to have an expectation of privacy").

Appellant failed to meet his burden of demonstrating a justifiable, reasonable, or legitimate expectation of privacy in either Room 1408 or Brandy's Jeep. Consequently, he cannot complain of an alleged violation of his Fourth Amendment rights resulting from the searches and seizures at issue. Because Appellant lacks standing, the trial court did not abuse its discretion in denying Appellant's motion to suppress.[28] We overrule point of error nineteen.

---

[28] Since we conclude that Appellant does not have standing to challenge the hotel room search, we need not address the trial court's alternative determination that the search was lawful under the emergency doctrine exception.

## VI.     Absence From the Courtroom

In point of error eighteen, Appellant contends that his rights under the Due Process Clause of the Fourteenth Amendment were violated by his absence from the courtroom on two occasions:  once during a pretrial hearing and once during jury selection.

"A leading principle that pervades the entire law of criminal procedure is that, after indictment, nothing shall be done in the absence of the prisoner." *Lira v. State*, 666 S.W.3d 498, 510 (Tex. Crim. App. 2023) (quoting *Lewis v. United States*, 146 U.S. 370, 372 (1892)).  The constitutional right to presence during trial is rooted to a large extent in the Confrontation Clause of the Sixth Amendment, *see Illinois v. Allen*, 397 U.S. 337, 338 (1970), but the United States Supreme Court has recognized that this right also has a due process component, *United States v. Gagnon*, 470 U.S. 522, 526 (1985).  *See Lira*, 666 S.W.3d at 511.  Accordingly, the right to be present is not restricted to situations where the defendant is "actually confronting witnesses or evidence against him" but encompasses all trial-related proceedings at which the defendant's presence "has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Gagnon*, 470 U.S. at 526 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105–06, 108 (1934), *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964)).

The due process right to be present applies at any stage of the criminal proceeding that is critical to its outcome "if the defendant's presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987); *see Hughes v. State*, — S.W.3d —, No. PD-0164-22, slip op. at 10 (Tex. Crim. App. May 22, 2024).  But the right is not absolute.  *King v. State*, 666 S.W.3d 581, 585 (Tex. Crim. App. 2023).  The

propriety of excluding a defendant from a trial proceeding should be considered in light of the whole record. *Gagnon*, 470 U.S. at 526–27; *Snyder*, 291 U.S. at 115. If a defendant could have done nothing or had nothing to gain by attending, there is no violation. *Gagnon*, 470 U.S. at 527; *Snyder*, 291 U.S. at 108.

Appellant first asserts that, during a pretrial hearing, he was "abruptly removed from the courtroom" after he repeatedly interrupted the proceedings. According to Appellant, after his removal, his trial counsel "took advantage of [his] absence to announce publicly their willingness to negotiate" a plea bargain.

The record reflects that the pretrial hearing at issue was a status hearing to schedule a hearing to address defense counsel's motion to withdraw their request for a competency evaluation as well as Appellant's request to represent himself. After conferring with the court coordinator, the trial court set the matters for a hearing and explained to Appellant that his concerns would be addressed at that scheduled hearing. When Appellant continued talking about the issues that the court had just advised him would be addressed at the later scheduled hearing, the trial judge directed the deputies to take Appellant back to the jail. After Appellant left the courtroom, one of Appellant's attorneys inquired about whether "there is any room for negotiation" and whether the prosecution would consider a plea for a life sentence. The trial court indicated that "this particular arena is not the best place to do your [plea] negotiations" but allowed the District Attorney to respond to counsel's inquiry. The District Attorney indicated that the State was not amenable to plea negotiations, stating that the State's intention to seek the death penalty "won't waiver [sic]."

Counsel's inquiry was not a "critical stage" in contemplation of Appellant's constitutional right to be present. As the trial court noted, this inquiry was, in effect, an attempt to engage in plea negotiations. We find no authority suggesting that due process requires a defendant's presence during plea negotiations conducted by his attorneys on his behalf. Such negotiations routinely take place during conversations between counsel in person, through letters, via email, and on phone calls—all in the defendant's absence. Appellant argues that his counsel's inquiry "could have tainted the jury pool if reported in the media," but his presence during the inquiry would not have changed that possibility. He further argues that his absence deprived him of the opportunity to protest or convey his refusal to accept a plea. But counsel's inquiry about plea negotiations did not bind Appellant to any plea nor deprive him of the opportunity to reject any plea offer should the State have been willing to forgo seeking the death penalty.

Appellant also complains about his absence from the courtroom during a discussion, before the start of individual voir dire questioning, between the trial court and defense counsel concerning what writing implement Appellant would be provided during trial to take notes. The trial judge, noting Appellant's previous request for a pencil or pen, shared his decision to provide Appellant a marker. Apparently, in a prior discussion off the record, defense counsel had expressed concerns about Appellant attacking one of them with any writing implement given to him. The court inquired of counsel whether they still had that concern. Counsel responded by stating that, "just as a precaution," they brought crayons for Appellant to use, which gave them "an added warranty of safety." The trial judge agreed with that course of action. He also indicated that he addressed the

issue of counsel's safety concerns regarding a writing implement outside of Appellant's presence "so he won't hear that it came from you-all."

This discussion about a writing implement was not a "critical stage" in contemplation of Appellant's constitutional right to be present. Appellant contends that "the court deliberately excluded [him] from a speculative discussion about whether he would attack someone in court." He complains about the potential for adverse publicity, asserting that counsel "publicly airing the possibility … that [Appellant] would 'lunge' at one of them" could result in "disastrous" media reports reflecting that the court and counsel "purported to fear him." But, again, Appellant's presence during the discussion would not have changed that possibility. The trial court, sensitive to the strained relationship between Appellant and his counsel, reasonably questioned counsel about their safety concerns outside of Appellant's presence. Further, before the third prospective juror was brought in for individual questioning, Appellant asked the court if he could get something to write with "other than this crayon" given that he "[hadn't] done anything to anybody." Thus, within that same proceeding, Appellant was afforded the opportunity to address the issue raised in his absence.

In this case, we cannot discern how Appellant's presence during either the inquiry relating to plea negotiations or the discussion about a writing implement was required to ensure either fundamental fairness or a "reasonably substantial ... opportunity to defend against the charge." *See Snyder*, 291 U.S. at 115. The exchanges between the trial judge and Appellant's lawyers (and the District Attorney) were short interludes that were not the sort of event that a defendant has a right to personally attend. Further, Appellant

would not have gained anything by being present. *See id.* at 106–07 (observing that "[n]owhere in the decisions of [the Supreme Court] is there a dictum, and still less a ruling, that the Fourteenth Amendment assures the privilege of presence when presence would be useless, or the benefit but a shadow").

We conclude that Appellant's absence from the courtroom on these two occasions did not constitute constitutional error. *See King*, 666 S.W.3d at 585 (explaining that "there is no due process violation when the defendant's presence does not bear a reasonably substantial relationship to his or her defense"). We overrule point of error eighteen.

## VII.   Jury Charge Error – Guilt Phase

In two points of error, Appellant complains of error in the guilt phase jury charge. He contends that the trial court erred in failing to submit an Article 38.23 instruction (point of error twenty) and challenges the reasonable-doubt instruction given (point of error twenty-one).

A trial court is statutorily obligated to instruct the jury on the "law applicable to the case." *See* Art. 36.14. That duty exists even when defense counsel fails to object to inclusions or exclusions in the charge. *Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018). The trial court is "ultimately responsible for the accuracy of the jury charge and accompanying instructions." *Id.* (quoting *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007)).

We review alleged jury charge error in two steps:  first, we determine whether error exists; if so, we then evaluate whether sufficient harm resulted from the error to

require reversal. *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022); *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). The degree of harm required for reversal depends on whether the jury charge error was brought to the trial court's attention. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g) (setting forth standards of appellate review for jury charge error). If the alleged error was raised by an objection or request for an instruction, *see* Arts. 36.14, 36.15, the record need only show "some harm" to obtain relief; if the alleged error was not raised, reversal is required only if the appellant suffered "egregious harm," *Alcoser*, 663 S.W.3d at 165. *See Almanza*, 686 S.W.2d at 171.

**A.** *Article 38.23 Instruction*

Article 38.23 provides that no evidence obtained in violation of the laws or Constitutions of Texas or the United States shall be admitted in evidence against the defendant at trial. *See* Art. 38.23(a). The statute further provides for a jury instruction if the legality of a search or seizure is raised at trial:

> In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

*Id.* Article 38.23 is substantive in nature, providing a remedy for a violation of "a suspect's privacy, property, and liberty rights against overzealous law enforcement." *Wilson v. State*, 311 S.W.3d 452, 459 (Tex. Crim. App. 2010).

But, like the Fourth Amendment, Article 38.23 has a standing requirement. This Court has repeatedly held that the right to complain about an illegal search and seizure

and invoke the statutory exclusionary remedy "is a privilege personal to the wronged or the injured party." *Fuller v. State*, 829 S.W.2d 191, 202 (Tex. Crim. App. 1992), *overruled on other grounds by Riley v. State*, 889 S.W.2d 290, 301 (Tex. Crim. App. 1993) (quoting *Craft v. State*, 295 S.W. 617, 618 (1927)). Accordingly, one who has not suffered infringement of a legal right does not have standing to complain. *Chavez v. State*, 9 S.W.3d 817, 819, 822 (Tex. Crim. App. 2000); *Fuller*, 829 S.W.2d at 202.

As previously discussed, Appellant has no standing to complain about the seized evidence under the Fourth Amendment. For the same reasons, he likewise lacks standing to complain under Article 38.23. Because Appellant lacks standing to raise either a constitutional or a statutory challenge to the legality of the search of the hotel room or the Jeep, or the seizure of the evidence from them, he was not entitled to an Article 38.23 instruction regarding the seized evidence. *See Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008). We overrule point of error twenty.

### B. *Reasonable-Doubt Instruction*

In the jury charge, the trial court included the following instructions concerning the State's burden of proof:

> The prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, you must acquit the defendant.

> It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all "reasonable doubt" concerning the defendant's guilt.

> During the charge conference, Appellant objected to the phrase that the

prosecution was not required to prove guilt "beyond all possible doubt"—language that was once mandated under *Geesa v. State*.[29]  Appellant asserted that the phrase "dilute[d] the reasonable doubt standard of proof" and, therefore, violated his constitutional and statutory right to be convicted only upon proof beyond a reasonable doubt.  *See* U.S. CONST. amend V, XIV; TEX. CONST. Art. 1, § 19; TEX. PENAL CODE § 2.01.  The trial court overruled the objection.

Appellant asserts on appeal that the trial court erred in submitting the sentence informing the jury that the prosecution need not prove guilt "beyond all possible doubt" because it violated his Fourteenth Amendment right to due process.  He relies on *Paulson v. State*, in which this Court stated that giving the *Geesa* instruction upon the parties' agreement, as was the case in *Paulson*, is not reversible error.  *See* 28 S.W.3d 570, 573

---

[29] In *Geesa v. State*, this Court determined that a defendant was entitled to "a full definitional instruction to the jury on reasonable doubt" and expressly adopted a six-paragraph instruction to be "submitted to the jury in all criminal cases, even in the absence of an objection or request by the State or the defendant."  820 S.W.2d 154, 162 (Tex. Crim. App. 1991).  The adopted definition included, in its third paragraph, the instruction at issue here: "It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all 'reasonable doubt' concerning the defendant's guilt."  *Id.*

In a subsequent interpretation of the *Geesa* instruction in *Reyes v. State*, this Court determined that the requirement to include it in the jury charge was "absolute" and "systemic," and that "the failure to submit such an instruction is automatic reversible error" not subject to harm analysis.  *See* 938 S.W.2d 718, 721 (Tex. Crim. App. 1996).

However, in *Paulson v. State*, this Court reconsidered the definitional requirement set forth in *Geesa* and *Reyes*, questioning the reasoning in *Geesa* and determining that *Reyes* should be overruled in its entirety.  28 S.W.3d 570, 572–73 (Tex. Crim. App. 2000).  We specifically criticized the fourth and fifth paragraphs of the *Geesa* definition, which attempted to define "reasonable doubt" in terms of the type of doubt that would make a reasonable person "hesitate," and to characterize "proof beyond a reasonable doubt" as proof so convincing that one would rely and act upon it "without hesitation."  *Id.* at 572; *see Geesa*, 820 S.W.2d at 162.  Those paragraphs were not included in the instruction here.

(Tex. Crim. App. 2000). He suggests that this statement "indicates that when there is an objection, it is error to give such an instruction."

Appellant's reliance on *Paulson* is misplaced. In *Woods v. State*, we held that giving the instruction at issue here to the jury in a capital murder trial was not an abuse of discretion. *See* 152 S.W.3d 105, 115 (Tex. Crim. App. 2004). We reaffirmed that holding in *Mays v. State*. *See* 318 S.W.3d 368, 389 (Tex. Crim. App. 2010). Appellant acknowledges our holdings in *Woods* and *Mays*, but nevertheless claims that the trial court here submitted the "beyond all possible doubt" instruction without analyzing whether the instruction "actually comported with the law concerning reasonable doubt instructions."

We disagree. While we have stated that "the better practice is to give no definition of reasonable doubt at all to the jury," *Paulson*, 28 S.W.3d at 573, we have explicitly held, on multiple occasions, that a trial court does not abuse its discretion in submitting language identical to the language presented in the jury charge here. *See Woods*, 152 S.W.3d at 114–15; *Mays*, 318 S.W.3d at 389. Appellant provides nothing to distinguish his case from our precedent. He fails to demonstrate that the trial court's submission of the instruction here failed to comport with the law governing reasonable doubt instructions. Accordingly, we conclude that the trial court did not err in submitting the challenged instruction. We overrule point of error twenty-one.

## VIII. Jury Charge Error – Punishment Phase

In nine points of error, Appellant complains of error in the punishment charge. He contends that the verdict form submitting the mitigation special issue to the jury, for each

capital murder count, erroneously failed to require unanimity for a negative answer to the issue, erroneously required unanimity for an affirmative answer on the issue, and erroneously imposed on him a burden of proving the issue beyond a reasonable doubt. He argues that the erroneous form resulted in an illegal verdict, which deprived the trial court of the authority to sentence him to death, because the verdict lacked the unanimity required by statute (point of error one) and placed a burden of proof on the mitigation issue on him (point of error two). He asserts that the erroneous verdict form deprived him of his statutory right to a jury (point of error three). He argues that, by requiring unanimity for a life sentence but not for a death sentence, the verdict form violated the Eighth Amendment's prohibition on cruel and unusual punishment (point of error four), his right to due process (point of error five), and Article 37.071 (point of error eight). And he contends that, by imposing a burden of beyond a reasonable doubt on him for the mitigation special issue, the verdict form violated the Eighth Amendment's prohibition on cruel and unusual punishment (point of error six), his right to due process (point of error seven), and Article 37.071 (point of error nine). We reverse and remand for a new punishment trial because the verdict form was incorrectly formulated and also because it erroneously placed a burden of proof on the mitigation issue.

A. *Error in the Jury Charge*

Article 37.071 requires the submission of two special issues to the jury—the "future dangerousness" issue and the mitigation issue—along with mandatory

instructions on answering those issues.[30]  *See* Art. 37.071, § 2(b)(1), (e)(1).  The State has the burden of proving the future dangerousness issue beyond a reasonable doubt, and the jury must answer the issue "yes" or "no."  *See* Art. 37.071, § 2(c), (d)(2).  The trial court must instruct the jury that it may not answer the future dangerousness issue affirmatively (adversely to the defendant) unless the jurors unanimously agree and may not answer the issue negatively (in the defendant's favor) unless ten or more jurors agree.  *See* Art. 37.071, § 2(d)(2).

Upon an affirmative answer to the future dangerousness issue, the jury must answer the mitigation issue.  *See* Art. 37.071, § 2(e)(1).  Neither party has a burden of proof on the mitigation issue.  *See Colella v. State*, 915 S.W.2d 834, 845 (Tex. Crim. App. 1995) ("No burden of proof exists for either the State or the defendant to disprove or prove the mitigating evidence.").  The jury must answer the issue "yes" or "no," and the trial court must instruct the jury that it may not answer the mitigation issue negatively (adversely to the defendant) unless the jurors unanimously agree and may not answer the

---

[30]  The future dangerousness issue asks, "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  Art. 37.071, § 2(b)(1).  The mitigation issue asks:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

Art. 37.071, § 2(e)(1).

Where the guilt phase jury charge allows the jury to convict a defendant as a party, the trial court must submit a third special issue, the "anti-parties" issue, which asks "whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken."  *See* Art. 37.071, § 2(b)(2).  That special issue did not apply in this case.

issue affirmatively (in the defendant's favor) unless ten or more jurors agree. *See* Art. 37.071, § 2(f)(1), (2).

The verdict form submitting the mitigation special issue to the jury, as it appeared for each capital murder count, is reproduced below (with redaction):

The language for the verdict options inverted the statutory language by requiring

unanimous agreement for an affirmative answer (in Appellant's favor) and allowing only ten or more jurors to agree to a negative answer (adverse to Appellant). In addition, the language applied a beyond-a-reasonable-doubt burden to the mitigation special issue.[31] We agree that multiple errors exist in this form.[32]

## B. *Harm Analysis*

In points of error five and eight, Appellant argues that the failure to correctly incorporate the requirement of unanimity for a death sentence, and erroneously requiring unanimity for a life sentence (inverting the "10-12" rule), violated his due process right to be free from arbitrary state action and violated Article 37.071. In points of error seven and nine, he argues that the erroneous imposition on him of a burden to prove beyond a reasonable doubt the existence of a sufficient mitigating circumstance violated his due process right to be free from arbitrary state action and violated Article 37.071. He maintains that these violations constitute "structural error" in the verdict form and require automatic reversal.

We disagree that the error in the verdict form is structural error requiring automatic reversal. "A 'verdict' is a written declaration by a jury of its decision of the issue submitted to it in the case." Art. 37.01. "[N]o statute requires the trial judge to

---

[31] When the trial judge read the punishment charge in open court, he did not read the verdict forms. After the judge finished reading the charge, the District Attorney informed the court (during a bench conference) that the mitigation special issue incorrectly included the beyond-a-reasonable-doubt burden of proof. The judge agreed that a burden should not be in the second special issue and indicated that he would "take it off the verdict form." But that correction did not occur; the language applying a beyond-a-reasonable-doubt standard remained in the verdict form.

[32] The State concedes that the verdict form is erroneous.

submit a written verdict form with the jury charge." *Jennings v. State*, 302 S.W.3d 306, 309 (Tex. Crim. App. 2010). But if a trial court attaches a verdict form to the jury charge, the verdict form becomes a part of the jury charge.[33] *Id.* at 310. Jury charge error stems from the denial of a defendant's right to have the trial court provide the jury with instructions correctly setting forth the "law applicable to the case." *Bell v. State*, 635 S.W.3d 641, 645 (Tex. Crim. App. 2021) (quoting Art. 39.14). Thus, error in the verdict form that fails to correctly set forth the applicable law constitutes jury charge error. All jury charge errors—including errors in the verdict form—are cognizable on appeal. *Jennings*, 302 S.W.3d at 310–11; *see, e.g.*, *Callins v. State*, 780 S.W.2d 176, 190–91 (Tex. Crim. App. 1989) (first applying *Almanza* analysis for determining harm in jury verdict form); *Olivas v. State*, 202 S.W.3d 137, 144–45 (Tex. Crim. App. 2006) (applying *Almanza* analysis to jury verdict form used for deadly weapon finding).

When alleged jury charge error was not brought to the trial court's attention, as is the case here, reversal is required only if the appellant suffered "egregious harm." *Alcoser*, 663 S.W.3d at 165; *see Almanza*, 686 S.W.2d at 171. Egregious harm exists if the error "affects the very basis of the defendant's case, deprives him of a valuable right, or vitally affects a defensive theory." *Alcoser*, 663 S.W.3d at 165. "A finding of egregious harm

---

[33] The jury charge in this case expressly incorporated the verdict forms. After setting forth the future dangerousness special issue, the charge directed the jury to "ANSWER 'YES' OR 'NO' in the spaces provided on Pages 7 and 9 of the charge" and, after setting forth the mitigation special issue, to "ANSWER 'YES' OR 'NO' in the spaces provided on Pages 8 and 10 of the charge." In addition, in the concluding general instructions, the charge instructed the jury, "When you have arrived at your answers to each of the Special Issues, if any, you shall use the attached forms provided at the end of these instructions."

must be based on 'actual harm rather than theoretical harm.'" *Id.* (quoting *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011)). "Egregious harm is a difficult standard to meet, and the analysis is fact specific." *Id.* In assessing harm, we review the entire jury charge, the state of the evidence, the argument of counsel, and any other relevant information revealed by the record. *Id.*

### 1. THE ENTIRE JURY CHARGE

Article 37.071 makes clear that a jury in a capital murder case may not answer the future dangerousness special issue "yes" unless the jurors agree unanimously and may not answer the mitigation special issue "no" unless the jurors agree unanimously. And the provisions of Article 37.071 require that the jury be instructed—in the jury charge—of those unanimity requirements. That was not done here.

The instructions for the mitigation issue within the jury charge were correct.[34] That is, the internal instructions did not invert the statutory language for unanimity as the verdict form did. Nor did the internal instructions apply a beyond-a-reasonable-doubt

---

[34] The instructions for the mitigation special issue were as follows:

You are instructed that you may not answer Special Issue Number 2 "NO" unless you agree unanimously.

You may not answer Special Issue Number 2 "YES" unless ten (10) or more jurors agree. Members of the jury need not agree on what particular evidence supports an affirmative finding on Special Issue Number 2.

In deliberating on Special Issue Number 2, you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness. If the jury returns an affirmative finding on Special Issue Number 1, and a negative finding on Special Issue Number 2, the Court shall sentence the Defendant to death. If the jury returns a negative finding on Special Issue Number 1, or an affirmative finding to Special Issue Number 2, the Court shall sentence the Defendant to confinement in the Texas Department of Criminal Justice for life without parole.

burden of proof. But as stated above, the verdict form, which was incorporated into the charge, incorrectly inverted the statutorily required "10-12" rule.

Further, while Article 37.071 plainly imposes a beyond-a-reasonable-doubt burden of proof for the future dangerousness issue on the State, the statute does not assign that burden of proof—or any burden of proof—on either party for the mitigation issue. *See Barnes v. State*, 876 S.W.2d 316, 330 (Tex. Crim. App. 1994) ("Neither this Court nor the Texas legislature has ever assigned a burden of proof on the issue of mitigating evidence."). Nonetheless, the verdict form here included a beyond-a-reasonable-doubt burden of proof for the mitigation issue. Using the erroneous verdict form required the jury, when determining whether a sufficient mitigating circumstance existed, to apply a burden of proof not required by law. We note that the language in the form did not itself impose the burden to prove or disprove mitigating evidence on either party. However, the verdict form required the jury to answer the mitigation issue adversely to Appellant if it had but "a reasonable doubt" as to the mitigation issue. Functionally, then, it is difficult to see how a jury could have understood this verdict form *except* as imposing a burden on Appellant to remove reasonable doubt to obtain a favorable mitigation answer.

Given the omitted unanimity instruction on the future dangerousness issue in the internal instructions in the charge and the inherent contradiction between the verdict form and the internal instructions concerning unanimity on the mitigation issue, the jury charge in this case failed to make clear that the jury had to render unanimous answers to both special issues for a death sentence. In addition, the only instruction in the jury charge concerning a burden of proof on the mitigation issue was the verdict form that incorrectly

required the jury to apply a beyond-a-reasonable-doubt burden of proof—and functionally placed that burden on Appellant. Nothing elsewhere in the jury charge ameliorates the contradicting instructions regarding the verdict form's inverted application of the "10-12" rule, the erroneous application of a burden of proof to the mitigation issue, the functional placement of that burden on Appellant, or the combined effect of these errors.

2. THE STATE OF THE EVIDENCE

Given the nature of the jury charge error here, a review of the evidence does not assist us in assessing harm. "[T]he weighing of 'mitigating evidence' is a subjective determination undertaken by each individual juror." *Colella*, 915 S.W.2d at 845; *see Wood v. State*, 18 S.W.3d 642, 649 (Tex. Crim. App. 2000) (explaining that "'we cannot meaningfully review the jury's normative decision on mitigation,' because the mitigation issue is specifically designed to take into account the jurors' individual assessments of a capital defendant's deathworthiness") (quoting *McFarland v. State*, 928 S.W.2d 482, 499 (Tex. Crim. App. 1996), *overruled on other grounds by Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998)). Accordingly, we have consistently declined to review "the jury's normative decision on mitigation, whether it answers in the affirmative or the negative." *Young v. State*, 283 S.W.3d 854, 865 (Tex. Crim. App. 2009).

3. ARGUMENTS OF COUNSEL

In reviewing the jury arguments made by counsel, nothing in the arguments of the parties explicitly encouraged the jurors to be unanimous in an affirmative answer or to be non-unanimous in a negative answer to the mitigation special issue. The State did not

discuss the unanimity requirement for either special issue. However, in concluding his closing argument, the District Attorney appears to have pointed to the verdict form when indicating how the jury should answer the special issues. This gesture would have directed the jurors' attention to the erroneous inversion of the statutory language. Defense counsel informed the jury several times about the unanimity requirement— "Death is only imposed if all 12 of you jurors vote for death."—but all except one of these unanimity comments were in the context of answering the future dangerousness issue. However, defense counsel did inform the jury that "voting in favor of life imprisonment … takes ten votes," which correctly contradicted the erroneous verdict form. Ultimately, neither party invited the jury to answer the mitigation special issue affirmatively with a unanimous verdict or negatively with a non-unanimous verdict, but neither did either party correct the error in the verdict form that failed to require a unanimous "no" to the mitigation issue for a death sentence and required a unanimous "yes" for a life sentence.

Concerning jury arguments about the burden of proof, both parties discussed the burden of proof, and how high the burden was, as it related to the future dangerousness issue.[35] Regarding the mitigation issue, the prosecutor argued that "Special Issue No. 2 has no burden of proof by the State. We don't have to prove it to you." Combined with the error in the verdict form, which functionally placed the burden on Appellant, this

---

[35] The State argued that it accepted and had met the "high burden" of proving that Appellant was a future danger. Defense counsel reminded the jury that the burden of proof on that issue was beyond a reasonable doubt, which is "the highest standard of proof that we have in our criminal justice system."

argument further suggested that Appellant bore the burden on the mitigation issue.

Defense counsel did not address the burden of proof, or lack thereof, for the mitigation

issue. Ultimately, though neither party expressly invited the jury to apply a burden of

proof when answering the mitigation special issue, neither did either party correct the

error in the verdict form functionally assigning a beyond-a-reasonable-doubt burden to

Appellant—and the State's argument reinforced that implicit assignment.

4.  OTHER INFORMATION IN THE RECORD: POLLING OF THE JURY

Other relevant information in the record includes the polling of the jury about the

punishment verdicts.[36] When the verdicts were received in open court, the trial court did

not read the verdict forms verbatim when announcing the verdicts. Instead, the court

paraphrased the jury's answers.[37]

Appellant requested that the jury be polled. The trial court did so by addressing

the jurors collectively rather than questioning each individual juror:

> Members of the jury, you have heard me read what your verdict was, what
> your answers to the questions that were posed to you were. I am now going

---

[36] Each capital murder count had two verdicts, one for each special issue. The two counts for aggravated assault on a public servant each had one verdict (though each verdict assessed both prison time and a fine).

[37] With respect to the capital murder counts, the court paraphrased the verdicts as follows:

… In Cause No. 2012-CRO-674, the case styled in the State of Texas versus [Appellant], this is the verdict on punishment as to Count 1.

The answer to Special Issue -- Special Issue No. 1: Yes.

With regard to Special Issue No. 2, as to Count 1, the answer, signed by the presiding juror: No.

With regard to Count 2, verdict on punishment, answer to Special Issue No. 1, answer, signed by the presiding juror: Yes.

Answer to Special Issue No. 2 as to Count 2, signed by the presiding juror, answer: No.

to ask you that if, in fact, that is your individual vote, your individual response, to these questions and verdict, to please raise your right arm now.

The jurors complied, and the trial court noted "that all 12 individuals of the jury have raised their right arm high."

## C. *Discussion and Conclusion*

"[B]ecause death is qualitatively different from any other punishment, the federal Constitution requires the highest degree of reliability in the determination that it is the appropriate punishment." *Hall v. State*, 663 S.W.3d 15, 36 (Tex. Crim. App. 2021) (quoting *Morris v. State*, 940 S.W.2d 610, 615 (Tex. Crim. App. 1996)); *see Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). "That heightened reliability is achieved by the Texas statutory scheme with its special issues and its mandatory instructions to the jury." *Gardner v. State*, 306 S.W.3d 274, 303 (Tex. Crim. App. 2009).

Under Article 37.071, upon conviction for capital murder, the default sentence is life imprisonment unless the jury unanimously answers the special issues in a manner that requires the trial court to impose a death sentence. *See* Art. 37.071, § 2(b)–(g). Thus, the procedural requirement for a verdict supporting a death sentence, as set forth in the mandatory provisions of Article 37.071, is, without question, a valuable statutory right. *See Prystash v. State*, 3 S.W.3d 522, 536–37 (Tex. Crim. App. 1999) (stating that Article 37.071 ensures "the proper level of juror deliberation" before they jury can consent to a sentence of death).

And though Appellant's challenge to the verdict form is premised on the statutory violations of Article 37.071, these violations implicate his right to due process under the

Fourteenth Amendment. The United States Supreme Court has explained,

> Where … a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law. The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State.

*Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (internal citations omitted). The Texas statutory death penalty scheme compels a life sentence absent jury unanimity on the special issues. Further, the statutory scheme imposes no burden of proof on Appellant to secure a life sentence. Given the mandatory nature of Article 37.071, Appellant had a substantial and legitimate sentencing expectation and a constitutionally protected liberty interest in the statutory requirement for jury unanimity for a death sentence and a process that imposes no burden on him to obtain a life sentence.

In assessing the harm in this case, we must appreciate that the harm from the errors here stems from what the jurors knew (or were instructed) about the burden of proof on the mitigation issue but also from what the jury's verdict says and, more importantly, fails to say.

In addition, the verdict form compelled the jury to apply a burden of proof that Article 37.071 does not impose. And the language in the form functionally assigned that burden—the highest in our criminal justice system—to Appellant. Further, the prosecutor's closing-argument declaration that the State did not bear the burden of proof on the mitigation issue reinforced the implicit placement of that burden on Appellant.

That implication was further reinforced for one juror by the trial judge telling that juror, incorrectly, that the burden of proof for the mitigation issue "is actually on the defense." Only two seated jurors received correct information about the burden of proof on the mitigation issue, but that information was provided more than two months before the erroneous verdict form was given to the jury. Under these circumstances, it is entirely possible that the jury placed the high difficult burden of proof on Appellant, which is contrary to Texas law.

Both the United States Supreme Court and this Court have recognized the need for the highest degree of reliability in the determination that death is the appropriate penalty in a particular case. And, "[i]n view of the extreme penalties involved," this Court has recognized that "it is most important that a verdict in a capital murder case be certain[,] and its meaning and construction must not be left in doubt or to speculation." *Eads*, 598 S.W.2d at 307; *see Reese v. State*, 773 S.W.2d 314, 317 (Tex. Crim. App. 1989) ("A verdict must be certain, consistent, and definite. It may not be conditional, qualified, speculative, inconclusive, or ambiguous."). Due to the errors in the verdict form, the verdict in this case is *not* certain but is ambiguous, and its meaning *is* left in doubt and to speculation. Therefore, we cannot be confident that the determination that death is the appropriate penalty was reliably made here.

The verdict form's erroneous application of the mandatory procedure afforded by Article 37.071 deprived Appellant of the valuable statutory right of being sentenced to death only upon a correctly formulated jury charge, secured without a burden concerning mitigating evidence (especially a burden on Appellant), as well as his constitutionally

protected liberty interest without due process of law. *See Hicks*, 447 U.S. at 347. Thus, Appellant suffered egregious harm from the jury charge error. We sustain points of error five, seven, eight, and nine. Our disposition of these four points of error renders the remaining points of error asserting error in the verdict form moot. We therefore dismiss points of error one, two, three, four, and six as moot.

## IX.    Remaining Punishment Issues

Appellant raises four additional points of error that pertain only to the punishment phase of his trial. He contends that the trial court violated his constitutional right to confrontation by allowing rebuttal expert testimony via closed-circuit TV (point of error twenty-two). He asserts that Article 37.071 is unconstitutional "because it provides no definition of critical terms" and, therefore, the trial court erred in denying his motion to hold the statute unconstitutional and in failing to provide definitions of certain terms in the jury charge (point of error twenty-four). He argues that the "10-12 Rule" of Article 37.071, Sections 2(d)(2) and 2(f)(2), unconstitutionally misleads jurors concerning the true effect of their failure to agree on the special issue answers and, further, that the trial court erred in failing to instruct the jury on the potential impact of a single holdout juror (point of error twenty-five). And, he contends that Article 37.071, Section 2(f)(4), unconstitutionally limits the definition of mitigating evidence to that which reduces the defendant's blameworthiness and, therefore, the trial court erred in denying his motion to hold the statute unconstitutional and improperly limiting the jury's consideration of the mitigation evidence by giving the statutorily mandated instructions (point of error twenty-six).

Having sustained points of error five, seven, eight, and nine, with this opinion we vacate Appellant's death sentences and remand this cause for a new punishment trial. This disposition renders moot these points of error, which arise from and affect only the punishment stage of Appellant's trial. Therefore, we dismiss points of error twenty-two, twenty-four, twenty-five, and twenty-six as moot.

**Conclusion**

We affirm the trial court's judgment of conviction for both counts of capital murder. However, because the errors in the punishment verdict forms for the mitigation issue caused Appellant egregious harm, we vacate Appellant's death sentences and remand this cause for a new punishment trial.

Delivered: May 7, 2025
Publish